PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 09-2437
_____

EN HUI HUANG,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,
Respondent

_____

On Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA 1:A099-583-314)
Immigration Judge:  Hon. Henry Dogin

_____

Argued
July 12, 2010

Before:  RENDELL, JORDAN, and GREENAWAY, JR.,
*Circuit Judges*

(Filed September 8, 2010)

_____

Richard Tarzia   [ARGUED]
P.O. Box 489
Belle Mead, NJ   08502
        *Counsel for Petitioner*

Eric H. Holder, Jr.
Thomas W. Hussey
Sada Manickam   [ARGUED]
Joan E. Smiley
United States Department of Justice
Office of Immigration Litigation, Civil Div.
P.O. Box 878
Ben Franklin Station
Washington, DC   20044
        *Counsel for Respondent*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

En Hui Huang appeals an order of the Board of Immigration Appeals ("BIA") reversing the grant of asylum entered by an immigration judge ("IJ").  Huang contends that the BIA applied the incorrect standard of review when evaluating the merits of the IJ's disposition, and that it abused its discretion in failing to consider evidence that she submitted for the first time on appeal.  For the reasons that follow, we will

2

grant Huang's petition for review and remand this case to the BIA for further consideration of her claims for asylum and withholding of removal.

## I. Factual Background

Huang is a citizen and native of China, whose home village is located in the town of Guan Tou, Fujian Province. On February 1, 2003, she entered the United States through Washington, D.C. without valid entry documentation. She initially moved to Altoona, Pennsylvania, where she began a romantic relationship with Duan Zheng Huang, who is also an illegal alien and citizen of China.[1] The couple later relocated to New York City, where they were married, and where Huang gave birth to their first child, a son, on October 22, 2004. Their second child, a daughter, followed on April 27, 2006.

On December 1, 2005, while pregnant with her daughter, Huang filed a petition for political asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The petition sought relief on the ground that, once Huang gave birth to her daughter, she would be in violation of Chinese family-planning policies, which generally permit Chinese citizens to have only one child. Huang stated in the petition that her mother, aunt, and three aunts-in-law had undergone compulsory sterilization at the hands of Chinese

---

[1]Duan entered the United States in 2000 and applied for asylum the same year. An IJ denied his petition, and the BIA affirmed that denial sometime in 2003.

authorities, and that she would likewise be "forced to be sterilized" under those policies if she returned to China. (R. at 2283.) The filing of Huang's asylum petition apparently alerted the Department of Homeland Security ("DHS") to her illegal status in the United States because, on January 31, 2006, the government served Huang with a notice to appear, charging her with being a removable alien. Removal proceedings commenced in New York but, because Huang had moved to East Orange, New Jersey around the time that her daughter was born, her case was transferred to New Jersey.

A.     *Proceedings before the IJ*

On April 25, 2007, an IJ conducted a hearing on Huang's petition. Huang testified that, because she has violated family-planning policies, she fears she will be sterilized if she returns to China. To corroborate her testimony, Huang produced a letter from her in-laws, Li Ping Ye and Chun Cai Wang, dated August 8, 2006 ("the in-laws' letter"), in which her in-laws stated that they spoke with Fujian family-planning authorities who informed them that Huang will be sterilized and fined if she returns to China. She also submitted an affidavit from a native of Fujian Province who resided in Japan as a student for several years and fathered two children while living there. According to the affidavit, Fujian family-planning authorities forced him to be sterilized when he returned to China. In addition, the IJ considered a letter dated January 9, 2007, that the government obtained from the State Department ("the 2007 State Department letter") regarding whether compulsory sterilization continues to occur in Fujian Province. According to the letter, "Chinese officials assert that national laws and policy and

4

provincial regulations do not permit forced abortions or sterilizations, [but nonetheless] there is evidence that they have taken place ... ." (R. at 1353.) The letter referred to the State Department's 2007 Profile of Asylum Claims and Country Conditions for China ("the 2007 Asylum Profile"), according to which the Department had received reports of compulsory sterilizations in Fujian Province as recently as 2006. The IJ also considered the State Department's 2006 Country Report on Human Rights Practices ("the 2006 Country Report"), reflecting that "forced sterilizations and abortions, in violation of the national law, continued to be documented in rural areas. During [2006], officials ... in Fujian province reportedly forcibly sterilized women." (*Id.* at 966.)

However, evidence from the State Department was equivocal regarding whether Fujian Province authorities would likely find that an alien like Huang, who had given birth to multiple children abroad, instead of in China, had actually violated family- planning policies. According to the 2007 State Department letter, foreign-born children are not considered permanent residents of China and therefore do not "count" for purposes of family-planning regulations unless they become Chinese citizens or register as members of their parents' household. (*Id.* at 1353.) Couples have no obligation to register foreign-born children, the letter indicates, but families with unregistered children must pay additional fees for unregistered children to have access to social services such as medical care and public education. Other evidence from the State Department, including a 2002 bulletin designed to give travelers an overview of Chinese society, states that "[c]hildren born in the United States to [Chinese] national parents ... are not

5

recognized as U.S. citizens under Chinese nationality law" and are instead "treated solely as [Chinese] nationals by Chinese authorities when in China." (*Id.* at 339.) That position is confirmed by a 2003 administrative decision issued by the Fujian Department of Family-Planning Administration ("FDFPA"),[2] which states that "if either parent remains a Chinese national and citizen without permanent residence overseas[,] any child of such a couple shall be treated as a Chinese national and citizen for ... domestic administrative purposes regardless of the child's nationality conferred by his or her country of birth." (*Id.* at 1895.) Thus, that administrative decision asserts that foreign-born children of Chinese nationals are automatically counted as Chinese residents for purposes of Fujian family-planning policies. (*See id.* at 1896 (stating, as the official position of the FDFPA, that an employee of the Chinese government who "reproduced a second child while on a family visit in the United States is in violation of family-planning regulations").)

---

[2]The Chinese central government in Beijing has promulgated a nationwide family- planning statute that requires each province and municipality to establish its own set of family-planning regulations and to create both provincial and municipal authorities to oversee and enforce those regulations. While the record does not expressly describe the functions of the Fujian Department of Family Planning Administration, it appears that the FDFPA is the authority charged with overseeing province-wide family-planning policies.

Citing the conflicting evidence, the IJ granted Huang's asylum application. The IJ concluded that Huang possessed a well-founded fear of persecution because the birth of her second child likely placed her in violation of Fujian family-planning regulations. While recognizing that the 2007 State Department letter intimated that an alien in Huang's situation would not be sterilized, the IJ nevertheless found that "[t]he children will come to the attention of the authorities and there's a strong possibility [Huang] will be forbidden to have any other children and some sort of procedure will be carried out on her and/or her husband." (R. at 1322.)

B.    *Proceedings before the BIA*

The government appealed to the BIA, challenging the grant of asylum on the basis that reports of compulsory sterilization varied greatly from municipality to municipality and that Huang had failed to show she would return to an area in Fujian Province where such procedures actually occurred. The government also contended that Huang lacked a well-founded fear of persecution because she could avoid sterilization by choosing not to register her children as permanent residents of China.

1.    *Huang's Newly Submitted Evidence*

In response, Huang submitted several pieces of evidence that she had not produced before the IJ but which she urged the BIA to consider in the first instance. Among those exhibits was a DHS report dated April 17, 2007, that contained a response from the Fujian Province Office of Foreign Affairs to a DHS

7

inquiry seeking, among other things, clarification regarding whether foreign-born children of Chinese nationals are counted under Fujian family-planning policies.[3] Fujian officials responded that whether foreign-born children count toward family-planning quotas depends upon whether their parents register them as permanent Chinese residents when the family returns to China. Children who have been formally registered will be considered for purposes of family-planning enforcement. Children who have not been formally registered are not considered permanent residents of China and therefore do not count, but, as indicated in the 2007 State Department letter, parents must pay additional fees in order for such children to use many social services.

In addition to the DHS report, Huang submitted Chinese family-planning propaganda, Chinese travel documents for her children, and two administrative decisions from the FDFPA and the Changle City Planning Board indicating that foreign-born children are counted for family-planning purposes. She also submitted two documents dated November 15, 2007, obtained from her mother-in-law, Li Ping Ye. The first document is an affidavit in which Ye testifies that she inquired with family-planning officials in Huang's husband's hometown of Fuzhou, Fujian Province, whether Huang will face sanctions if she returns to China. According to the affidavit, those officials informed Ye that, despite the national government's policy

---

[3]While the report was not prepared for use in Huang's case, several of the documents it discusses were submitted in support of her petition.

8

against mandatory sterilization, "Chinese citizens ... must obey the family planning policy of China, one child IUD inserted, two children sterilization; unless they are not Chinese citizens[. A]lthough, [Huang and her husband] gave birth[] to two children in U.S., one of the couple must be sterilized with fines as well" upon returning to China. (R. at 148.) The second document is a written certification purportedly issued by Fuzhou family-planning authorities in response to Ye's inquiry, indicating that an "IUD must be inserted after giving birth to a boy, and can not give birth again. The second child is allowed with birth permit after interval of four years if the first child is a girl, sterilization must be implemented after that." (*Id.* at 152.)

Huang argued that, if the BIA was inclined to reverse the IJ's grant of asylum on the existing record, it should nevertheless affirm based on the newly submitted evidence. Huang also asked, in a motion filed as part of her brief (hereinafter "the motion to remand"), that, if the BIA refused to consider the new evidence, it nevertheless remand the case to the IJ and reopen the record for consideration of that evidence by the IJ in the first instance. The BIA denied the motion in a footnote, stating that "[t]he Board does not consider evidence submitted on appeal" and that, in any event, many of the documents were cumulative of other evidence in the record. (*Id.* at 4 n.1.)

### 2. *The Merits of Huang's Asylum Petition*

On the merits, the BIA reviewed *de novo* the IJ's grant of asylum and reversed it, saying that an objectively reasonable person in Huang's situation would not have harbored a fear of

persecution. The BIA gave four reasons for its holding. First, it observed that no uniform policy of sterilization exists in Fujian Province and that, while violators of family-planning policies sometimes face fines, officials often impose no sanctions. Second, it noted that Huang had produced no evidence that she would be individually targeted for sterilization. Third, the BIA concluded that the affidavit from the Chinese citizen who returned from Japan was unreliable because it "did not contain all of the underlying facts of that case." (*Id.* at 5.) Finally, the agency rejected the in-laws' letter as a basis for a well-founded fear of persecution because the letter contained multiple layers of hearsay. The BIA did not comment on the State Department reports intimating that compulsory sterilization continues in some parts of Fujian Province. On November 6, 2008, the BIA entered a final order of removal.[4] Huang then filed a timely petition for review.

## II. Jurisdiction and Standard of Review

We have jurisdiction under 8 U.S.C. § 1252(a)(1) to review a final order of removal issued by the BIA. The BIA possesses appellate jurisdiction over IJs' decisions, which the BIA may either summarily affirm or analyze in an independent opinion. 8 C.F.R. § 1003.1(e)(4)-(6). If the BIA summarily affirms an IJ's order, we review the IJ's decision as the final

---

[4]The BIA also rejected Huang's claims for withholding of removal and relief under the CAT, for essentially the reasons it gave for denial of her asylum petition. The CAT claim is not before us on appeal.

10

administrative determination. *Konan v. Att'y Gen.*, 432 F.3d 497, 500 (3d Cir. 2005). When the BIA issues a separate opinion – as it did in Huang's case – we review the BIA's disposition and look to the IJ's ruling only insofar as the BIA defers to it. *Chavarria v. Gonzalez*, 446 F.3d 508, 515 (3d Cir. 2006).

The BIA's ruling on an asylum petition is "conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). We review the facts upon which the BIA's decision rests to ensure that they are supported by substantial evidence from the record considered as a whole, *Espinosa-Cortez v. Att'y Gen.*, 607 F.3d 101, 106 (3d Cir. 2010), and we will reverse based on a factual error only if any reasonable fact-finder would be "compelled to conclude otherwise," 8 U.S.C. § 1252(b)(4)(B). We review the BIA's legal conclusions *de novo*, but we accord deference under *Chevron v. National Resources Defense Counsel, Inc.*, 467 U.S. 837 (1984), to its interpretation of statutes and regulations within its enforcement jurisdiction. *Wang v. Ashcroft*, 368 F.3d 347, 349 (3d Cir. 2004); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding that an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation" (citation and quotation marks excluded)).

III.    **Discussion**

Huang raises three issues on appeal. First, she argues that the BIA did not apply the correct standard of review to the IJ's determination that she had a well-founded fear of

11

persecution. Second, she contends that, even if the BIA applied the correct standards of review, it abused its discretion in reversing the IJ's grant of asylum because the evidence of record was sufficient to show that she has a well-founded fear of persecution in the form of mandatory sterilization. Third, she contends that the BIA abused its discretion in failing to remand her case to the IJ to consider her new evidence. Because the merits of Huang's asylum petition are intertwined with her challenge regarding the BIA's standards of review, we will address those issues together before discussing the motion to remand.

A. *The Asylum Petition*

Section 208 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158, confers authority upon the Attorney General to grant asylum to aliens who enter the United States if they qualify for refugee status. *Id.* § 1158(b)(1)(A). The Attorney General has delegated that authority to immigration judges, whose decisions are reviewable by the BIA. 8 C.F.R. §§ 1003.1(b), 1003.14.

To qualify for refugee status, an alien must show that he is unable or unwilling to return to his native country due either to past persecution or a well-founded fear of future persecution. 8 U.S.C. § 1101(a)(42)(A); *Chavarria*, 446 F.3d at 516. The INA contains no statutory definition of "persecution," but we have explained that the term does not encompass all forms of unfair, unjust, discriminatory, or unlawful treatment; rather it covers only severe humanitarian mistreatment, such as "death threats, involuntary confinement, torture, and other severe

12

affronts to the life or freedom of the applicant." *Gomez-Zuluaga v. Att'y Gen.*, 527 F.3d 330, 341 (3d Cir. 2008). To constitute a basis for asylum, the persecution must have been motivated by a statutorily protected ground, namely the alien's race, religion, nationality, political opinion, or membership in a particular social group. 8 U.S.C. § 1101(a)(42)(A). A person who is forced to undergo an abortion or a sterilization, or who has been persecuted for refusing to comply with a coercive population control policy, is deemed to have been persecuted based on political opinion.[5] *Id.* § 1101(a)(42)(B). Similarly, a person who has a well-founded fear of those consequences is deemed to have a well-founded fear of political opinion-based persecution. *Id.* The alien bears the burden of proving eligibility for asylum through credible evidence. 8 C.F.R. § 1208.13(a); *Butt v. Gonzales*, 429 F.3d 430, 433 (3d Cir. 2005). In this case, past persecution is not at issue. Huang's right to

---

[5]Mandatory birth-control measures short of abortion or sterilization, such as insertion of an IUD or required gynecological screenings, do not, on their own, rise to the level of persecution and therefore cannot be the sole support of an award of asylum. *In re M-F-W- & L-G-*, 24 I. & N. Dec. 633, 636-37 (B.I.A. 2008). However, such measures do qualify as a "coercive population control program," and an alien may obtain asylum if he resists those measures and the government persecutes him as a result. *Id.* at 638. In this appeal, Huang seeks asylum based on the fear that she will be sterilized if returned to China. That fear, if well-founded, unquestionably entitles her to relief.

13

asylum turns only upon whether she has a well-founded fear of persecution in the form of sterilization if she returns to China.

To establish a well-founded fear of persecution, the alien must demonstrate, first, that the alien "has a fear of persecution . . . on account of race, religion, nationality, membership in a particular social group, or political opinion"; second, that there is a "reasonable possibility" that the alien will suffer persecution based on a protected ground if returned to his or her native country; and third, that the alien "is unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear." 8 C.F.R. § 1208.13(b)(2)(i).

The courts have interpreted the term "well-founded fear" to include both subjective and objective aspects: the alien must entertain a subjective apprehension that persecution will follow repatriation, and that apprehension must be objectively reasonable in light of the circumstances of the alien's case. *Sioe Tjen Wong v. Att'y Gen.*, 539 F.3d 225, 232 (3d Cir. 2008). The objective component of the analysis requires the alien to show that a reasonable person in his position would fear persecution, either because he "would be individually singled out for persecution" or because "there is a pattern or practice in his home country of persecution" against a group of which he is a member. *Id.* (internal quotations omitted); *see also Camara v. Att'y Gen.*, 580 F.3d 196, 202 (3d Cir. 2009) (observing that the objective component of the well-founded fear analysis requires the alien to demonstrate that "a reasonable person in her circumstances would fear persecution if returned to her native country").

14

### 1. BIA's Standards of Review in Asylum Cases

Under 8 C.F.R. § 1003.1(d)(3), the BIA may not reverse an IJ's factual findings unless they are clearly erroneous. *Id.* § 1003.1(d)(3)(i). The IJ's legal conclusions, however, are subject to plenary review. *Id.* § 1003.1(d)(3)(ii). The BIA also has plenary review over the IJ's exercise of discretionary authority. *Id.* Thus, questions of judgment, such as an IJ's decision to grant asylum, to reopen the record, or to reconsider a disposition, receive no deference from the BIA.[6] Whether a particular determination by the IJ constitutes a finding of fact or a conclusion of law is significant because that characterization affects the level of deference that the BIA must give to the determination.

In this appeal, Huang argues that the BIA did not apply the correct standard of review when it rejected the IJ's conclusion that she has a well-founded fear of persecution. Huang asserts that the question of whether an alien has a well-founded fear of persecution is a purely factual one and that the

---

[6]The BIA's standards of review differ markedly from the standard that governs our review of BIA decisions. We lack jurisdiction to review the grant or denial of many forms of discretionary relief, 8 U.S.C. § 1252(a)(2)(B), and when reviewing asylum petitions, over which we do possess jurisdiction, *id.*, we may not reverse the BIA's discretionary actions unless they are "contrary to law and an abuse of discretion." *Id.* § 1252(b)(4)(D).

BIA may reverse an IJ's finding that an alien has such a fear only if the finding is clearly erroneous. According to Huang, the BIA's reversal departed from the "clearly erroneous" standard because the record contains sufficient evidence to support the IJ's finding that she possesses a well-founded fear of sterilization. The government responds by relying on *In re A-S-B-*, 24 I. & N. Dec. 493, 498 (B.I.A. 2008), in which the BIA held that it exercises *de novo* review over the question of whether an alien possesses a well-founded fear of persecution because that determination requires speculation about future events and therefore does not qualify as fact-finding. Huang does not expressly challenge *A-S-B-*, but, in arguing that a well-founded fear of persecution presents a purely factual issue, she nonetheless calls that decision into question. Thus, we begin by considering whether *A-S-B-* is consistent with the standards of review described in § 1003.1(d)(3).

<blockquote>a.    *Validity of A-S-B- in the Asylum Context*</blockquote>

In *A-S-B-*, the BIA held that the forecasting of future events in an asylum case does not constitute fact-finding because predictions are inherently speculative and it is "impossible to declare as 'fact' things that have not yet occurred." 24 I. & N. Dec. at 498. The BIA has therefore taken the position that no deference is owed to an IJ's conclusion regarding the risk that an event will take place once an alien is repatriated. *Id.*; *see also In re H-L-H- & Z-Y-Z-*, 25 I. & N. Dec 209, 212 (B.I.A. 2010) ("We ... review de novo the question whether the respondent has carried her burden of establishing a well-founded fear that the family planning policy will be

16

enforced against her through means constituting persecution upon her return to China.").

In *Kaplun v. Attorney General*, 602 F.3d 260 (3d Cir. 2010), we considered in the context of a CAT claim whether *A-S-B-* set forth a valid interpretation of the standards of review required by § 1003.1(d)(3). The BIA had, as in asylum cases, concluded that the forecasting of future events in the CAT context did not constitute fact-finding because it involved speculation. *See In re V-K-*, 24 I. & N. Dec. 500, 501 (B.I.A. 2008) ("Although predictions of future events may in part be derived from "facts," they are not the sort of "[f]acts determined by the Immigration Judge" that can only be reviewed for clear error." (quoting § 1003.1(d)(3))). We rejected that holding as a plainly erroneous interpretation of § 1003.1(d)(3) because the probability of an event occurring in the future exists independently of the event itself, and is therefore a separate and distinct "fact" in the relevant legal sense. *Kaplun*, 602 F.3d at 269. "This likelihood, while an assessment of a future event, is what a decision-maker in an adjudicatory system decides now as part of a factual framework for determining legal effect." *Id.* We explained that while the event may occur in the future, the possibility of its occurring exists in the present. Thus, a determination by an IJ that an event may take place when an alien is repatriated constitutes a finding of fact because the probability itself currently exists and gives rise to a present apprehension of the event it represents. *Id.* Accordingly, we concluded that, "insofar as the BIA interpret[s] 8 C.F.R. § 1003.1(d)(3) to hold that an IJ's assessment of [future events] is not a finding of fact because the events have not yet occurred,

17

... its interpretation plainly errs." *Id.* (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).

We reserved judgment in *Kaplun* regarding whether *A-S-B-*'s holding might nonetheless continue to govern in *asylum* cases. 602 F.3d at 269 n.7 ("To the extent that *A-S-B-* ... address[es] the standard of review applied to an IJ's determination of a 'well-founded fear of future persecution' in the asylum context ... , we do not purport to resolve that issue at this time."). We now conclude, however, that, for essentially the reasons expressed in *Kaplun*, *A-S-B-*'s interpretation of § 1003.1(d)(3) is plainly erroneous. That section applies to both CAT and asylum cases, and, though there are important distinctions between the two, *see infra* note 7, the process of forecasting future events is a factual inquiry in an asylum case for the same reasons it is in a CAT case. In considering a CAT case, the IJ must identify what events are likely to occur after repatriation and, once that is done, must determine whether the alien has demonstrated that what he is likely to suffer amounts to torture. Similarly, an asylum case requires the IJ to determine what events have a reasonable possibility of occurring, so that there can be an assessment of whether an alien possesses a well-founded fear of persecution. We therefore conclude that the interpretation of § 1003.1(d)(3) in *A-S-B-* cannot stand, and we hold that an IJ's forecasting of future events constitutes fact-finding that the BIA must review under the clearly erroneous standard. However, that is far from the end of the matter.

### b.  *Analysis of IJ Asylum Decisions*

The assessment of future events is only one part of the analysis of an asylum case based on the assertion of a well-founded fear of persecution.  In any asylum case predicated on the fear of future persecution, an IJ must answer three essential questions.  First, as just noted, the IJ must ask what may happen if the alien returns to his home country.  *See INS v. Cardoza-Fonesca*, 480 U.S. 421, 423 (1987) (reflecting that asylum protects aliens who show that they may be persecuted if they return home).  Second, the IJ must question whether those events meet the legal definition of persecution.  *See Shardar v. Ashcroft*, 382 F.3d 318, 324 (3d Cir. 2004) (rejecting an asylum claim because the alien failed to show that the treatment he might encounter upon returning home qualified as persecution).  Third, the IJ must consider whether the possibility of those events occurring gives rise to a well-founded fear of persecution under the circumstances of the alien's case.  *See Espinosa-Cortez*, 607 F.3d at 108 (stating that, to establish a well-founded fear, the alien must prove that he has a subjective apprehension of harm and that his fear is objectively reasonable).

As we stated above, the IJ's answer to the first question is factual in nature and is subject to clearly erroneous review by the BIA.  The answer to the second question – whether those events meet the legal definition of persecution – is reviewed *de novo* because it is plainly an issue of law.  *Cf.* Board of Immigration Appeals:  Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878, 54,890 (Aug. 26, 2002) ("The immigration judge's determination[] of whether ... facts demonstrate harm that rises to the level of 'persecution[]' ... [is]

19

not ... limited by the 'clearly erroneous' standard."). The question we turn to here is what standard of review the BIA should apply when a party challenges the IJ's answer to the third question, whether the facts support a well-founded fear of persecution.

To address that issue, we turn to the text of § 1003.1(d)(3) and to the Attorney General's guidance regarding implementation of that regulation.[7] *See Lewis v. Atlas Van Lines, Inc.*, 542 F.3d 403, 409 (3d Cir. 2008) ("We begin our analysis ... with the rule that '[t]he basic tenets of statutory construction apply to construction of regulations and our starting point on any question concerning the application of a regulation is its particular written text.'" (quoting *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Kempthorne*, 497 F.3d 337, 351 (3d Cir. 2007))); *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998) ("[T]he well-

---

[7]The text of 8 C.F.R. § 1003.1(d)(3)(i) & (ii) is as follows:

(d) Powers of the Board [of Immigration Appeals]– ...

(3) Scope of review.

(i) The Board will not engage in de novo review of findings of fact determined by an immigration judge. Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous.

(ii) The Board may review questions of law, discretion, and judgment and all other issues in appeals from decisions of immigration judges de novo.

20

reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (internal quotation omitted)).

Section 1003.1(d)(3) provides that IJ decisions that are purely factual in nature receive clear error review. 8 C.F.R. § 1003.1(d)(3)(i). All other decisions are reviewed *de novo*. *Id.* § 1003.1(d)(3)(ii). The Attorney General has explained that, under this two-tiered system, the highly deferential clearly erroneous review applies only to the IJ's description of the events and circumstances that

> form the factual basis for the decision under review. The 'clearly erroneous' standard does not apply to determinations of matters of law, nor to the application of legal standards, in the exercise of judgment or discretion. This includes judgment as to whether the facts established by a particular alien amount to "past persecution" or a "well-founded fear of future persecution."

Procedural Reforms to Improve Case Management, 67 Fed. Reg. at 54,890. The Attorney General's guidance thus suggests that the answer to the third question – whether the facts give rise to a well-founded fear of persecution – is subject to *de novo* review because it requires the exercise of judgment in the application of the well-founded fear standard to the facts of the alien's case. *Id.* The factual-versus-legal distinction is less clear on this point, however, because the definition of a well-founded fear of

21

persecution includes elements that are both legal and factual in nature.

The government's briefing correctly observes that judging the objective reasonableness of the alien's fear involves a "legal standard[] that must be applied to the immigration judge's factual findings, and [is] thus reviewed by the Board *de novo*." (Gov't Supp. Br. at 2.) In essence, the government acknowledges that whether an alien has a well-founded fear presents a mixed question of fact and law. We agree. A mixed question of fact and law is one that requires application of a legal standard to a particular set of circumstances. *See* 9C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2589, at 473 (3d ed. 2008) (characterizing mixed questions as those which "involve elements of both law and fact"). That is precisely the nature of the well-founded fear inquiry.

An IJ reviewing an assertion of well-founded fear must determine whether the alien has an objectively reasonable fear of persecution based on the events that may occur if he returns home. *See* Procedural Reforms to Improve Case Management, 67 Fed. Reg. at 54,890 (characterizing the well-founded fear inquiry as an analysis requiring "the application of legal standards"); *see also* Board of Immigration Appeals: Procedural Reforms to Improve Case Management, 67 Fed. Reg. 7309, 7315 (Feb. 19, 2002) (describing, in a proposed version of § 1003.1(d)(3), that the regulation was "not [designed to] preclude the Board from reviewing mixed questions of law and fact, including, without limitation, whether an alien has established a well-founded fear of persecution"). The factual

22

part of the inquiry requires the IJ to evaluate what may occur when the alien is repatriated, including whether there has been a pattern or practice in the alien's home country of targeting for persecution a statutorily protected group of which the alien is a member or whether he will be individually targeted based on a protected characteristic. The legal part of the inquiry requires the IJ to apply the objective reasonableness standard and determine whether the predicted events (and pattern or practice, if applicable) would cause a reasonable person in the alien's situation to fear persecution.[8] That legal piece of the analysis

_____

[8]There is an important difference between this kind of analysis and the one that we set forth in *Kaplun* for CAT claims. The CAT requires an alien to prove that it is more likely than not he will be tortured if he is repatriated. *Gomez-Zuluaga*, 527 F.3d at 349. Thus, an IJ may award relief under the CAT if the IJ, first, identifies what may occur when the alien returns home, second, attaches a probability of more than 50% to that event, and, third, determines that the probable event qualifies as torture. In an asylum case, however, "well-founded fear" turns not on an assessment of what is more likely than not but on what is "possible," and then on whether the alien's fear of that possibility is reasonable. *See Espinosa-Cortez*, 607 F.3d at 108 ("To satisfy the objective prong [of the well-founded fear test], the petitioner must show that a reasonable person in the alien's circumstances would fear persecution if returned to the country in question." (internal quotation marks and citation omitted)). Fundamental to the inquiry is a factual determination regarding whether the event the alien allegedly fears falls within the realm of the possible, but an equally fundamental component of the

properly receives *de novo* review from the BIA. 8 C.F.R. § 1003.1(d)(3)(ii) ("The Board may review questions of law, discretion, judgment and all other issues ... *de novo*.").

Treating the reasonableness of an alien's fear as a mixed question of fact and law is in keeping with how appellate tribunals typically treat issues of objective reasonableness. *See* 9C WRIGHT & MILLER, § 2589, at 473-74 ("[T]here is substantial authority that ... determination [of mixed questions of fact and law] is not within the ambit of the 'clearly erroneous' rule and they are freely reviewable ... ."). For example, in the context of qualified immunity for constitutional torts, the

---

analysis requires a judgment about whether the possible event actually gives rise to a reasonable fear. In terms of the "possibility," the Supreme Court has noted that "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Cardoza-Fonseca*, 480 U.S. at 431. An IJ may find an event to be reasonably possible and conclude that an alien would have a well-founded fear of persecution based on it. The BIA may review that decision, and conclude, without rejecting the IJ's factual finding regarding the possibility of the event, that, in its judgment, the possibility of the event does not give rise to an objectively reasonable fear of persecution. Such a determination does not reject the IJ's factual finding that the event may occur; it merely constitutes a judgment by the BIA that the event, though possible, does not give rise to an objectively reasonable fear. That exercise is properly performed using a *de novo* standard of review.

24

reasonableness of a state actor's conduct based on undisputed facts is subject to *de novo* review as a question of law. *See Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002) (concluding that the reasonableness of a state actor's conduct must be decided by the court). Similarly, when interpreting ambiguous contract provisions, courts ask as a matter of law how a reasonable person would read the term at issue. *See MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 210 (3d Cir. 2005) ("Whether a contract is ambiguous is determined according to an objective, reasonable-person standard and is a question of law."). Also, when ruling on a federal criminal defendant's claim for ineffective assistance of counsel, courts determine as a mixed question of fact and law whether the conduct of the petitioner's trial counsel comported with that of an objectively reasonable attorney. *See United States v. Cross*, 308 F.3d 308, 314 (3d Cir. 2002) (stating that ineffective assistance claims challenging the validity of a federal sentence "present mixed questions of law and fact" subject to *de novo* review). Even in negligence cases, where questions of reasonableness are submitted to juries and reviewed for clear error on appeal, *Travelers Indem. Co. v. Ewing, Cole, Erdman & Eubank*, 711 F.2d 14, 17 (3d Cir. 1983), federal courts have recognized that analyzing cases in that way "is an exception to the general rule that mixed questions of law and fact are reviewed *de novo*." *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 576 (9th Cir. 1995).

That standard of review is, moreover, consistent with the Attorney General's expressed goal in promulgating the BIA's two-tier level of review, namely, to bring national uniformity to immigration law by allowing the BIA "to consider and resolve instances where 'differing decisions may be reached based on

25

essentially identical facts.'" Procedural Reforms to Improve Case Management, 67 Fed. Reg. at 54,890 (quoting *In re Burbino*, 20 I. & N. Dec. 872, 873 (B.I.A. 1994)). Many aliens flee their home countries under very similar circumstances that should, in fairness, lead to similar outcomes in their asylum petitions. If a determination regarding an alien's well-founded fear were reviewed only under the clearly erroneous standard, it would be difficult to confront the problem of multiple IJs reviewing substantively similar asylum petitions but reaching different conclusions about whether a reasonable person would have a well-founded fear of persecution. The BIA would be powerless to correct the disparity, even when the petitions were identical in all meaningful respects. The BIA has recognized that preventing this type of discord among IJ decisions is one of its major institutional goals, and one that requires it to exercise *de novo* review over how reasonable people would respond to a particular set of facts. *Burbino*, 20 I. & N. Dec. at 873-74 ("The advantage of an independent standard of review is that it promotes uniformity in the application of the various discretionary provisions of the [INA]"); *see also In re Crammond*, 23 I. & N. Dec. 9, 15 (B.I.A.) ("Important policy considerations favor applying a uniform federal standard in adjudicating removability . . . under the Act."), *vacated on other grounds by* 23 I. & N. Dec. 179 (B.I.A. 2001).

Characterizing objective reasonableness in this way is also consistent with our precedent. We have recognized that the BIA exercises *de novo* review over "the determination as to whether certain facts give rise to a well-founded fear of persecution." *Sheriff v. Att'y Gen.*, 587 F.3d 584, 592 (3d Cir. 2009). The well-founded fear inquiry depends heavily upon

applying a legal standard to the factual issues of a particular alien's case, and we have stated that the BIA's disposition of the inquiry "'must be upheld if it is supported by substantial evidence in the record.'" *Espinosa-Cortez*, 607 F.3d at 107 (quoting *Gomez-Zuluaga*, 527 F.3d at 340). Thus, the BIA has greater latitude in reviewing an IJ's decision on well-founded fear than do we when reviewing the disposition of the BIA itself.[9]  *Compare* Procedural Reforms to Improve Case

---

[9]Courts of Appeal have recognized a variety of situations in which administrative agencies – by virtue of their particular expertise and Congressional mandate – possess greater latitude in addressing mixed questions of fact and law than do appellate courts when reviewing administrative dispositions. *See Lion Uniform, Inc., Janesville Apparel Div. v. NLRB*, 905 F.3d 120, 123-24 (6th Cir. 1990) (finding that an agency could properly review an administrative law judge's award of attorney fees *de novo*, even though the same issue was reviewed by the court of appeals for substantial evidence, because the two types of appeal were designed to accomplish different functions: whereas the administrative appeal was designed to render disposition on behalf of the agency, judicial review was created only to ensure that the agency's decision was rooted in the record); *compare* 24 C.F.R. § 26.52(k) (providing that the Secretary of Housing and Urban Development, when reviewing decisions issued by an administrative law judge ("ALJ"), may "affirm, modify, reduce, reverse, compromise, remand, or settle any relief" granted by the ALJ), *with White v. U.S. Dep't of Hous. & Urban Dev.*, 475 F.3d 898, 904 (7th Cir. 2007) (indicating that the Secretary's determination receives "deferential[] review" from the court of

Management, 67 Fed. Reg. at 54,890 ("The 'clearly erroneous' standard does not apply ... to the application of legal standards, ... includ[ing] judgments as to whether the facts established by a particular alien amount to ... a 'well-founded fear of future persecution.'"), *with Kibinda v. Att'y Gen.*, 477 F.3d 113, 118-19 (3d Cir. 2007) (stating that the administrative determination regarding a well-founded fear of persecution must be upheld unless "the evidence not only supports a contrary conclusion, but compels it" (internal quotations omitted)). It is therefore appropriate for the Attorney General to grant the BIA *de novo* review over the "objective reasonableness" component of the well-founded fear inquiry, even though we grant greater deference to the BIA's disposition of that question on a petition for review.

In sum, evaluating whether a reasonable person would fear persecution under a particular set of circumstances requires the exercise of legal judgment in applying a standard of

_____

appeals and will be "reverse[d] only if the determination is legally or procedurally unsound, or is unsupported by substantial evidence" (internal quotation omitted)); *compare* 5 U.S.C. § 557(b) (stating that, when an ALJ renders a decision, the agency who has jurisdiction over that ruling may review that decision using "all of the power which it would have[,]" had it made the decision in the first instance), *with id.* § 706(2) (proving that a court reviewing an agency's final determination may reverse only, among other things, for a lack of substantial evidence or if the agency acted in an arbitrary manner or abused its discretion).

28

objective reasonableness to the facts of an alien's particular case. The resulting determination is one over which the BIA has plenary review. 8 C.F.R. § 1003.1(d)(3)(ii). Of course, part of the well-founded fear determination may depend on disputed facts, which must be resolved by the IJ, whose decisions in that regard are subject to clearly erroneous review. Once the IJ resolves factual issues, though, assessing how a reasonable person would respond to those facts is a question of law, and the BIA is within its authority to review that assessment under a *de novo* standard.

However, when the BIA reaches a different conclusion than the IJ, either on the facts or the law, its review must reflect a meaningful consideration of the record as a whole. It is not enough for the BIA to select a few facts and state that, based on them, it disagrees with the IJ's conclusion. *Cf. Sheriff*, 587 F.3d at 595 (faulting BIA for neglecting to consider several facts crucial to the petitioner's asylum application, including the fact that government forces in her native country had destroyed her home, murdered her mother, and raped her daughter in her presence). Instead, the BIA must describe its reasoning with enough specificity to inform the parties and us why it reached its conclusion. *See Awolesi v. Ashcroft*, 341 F.3d 227, 232 (3d Cir. 2003) ("In order for us to be able to give meaningful review to the BIA's decision, we must have some insight into its reasoning."). The BIA must show that it reviewed the record and considered the evidence upon which the IJ relied, and it must explain why the record warrants a different conclusion than the one reached by the IJ. In an asylum case, this means that the BIA must examine the record of the petitioner's case

and explain why, based on that record, an objectively reasonable alien would not fear persecution if returned to his home country.

2. *The Merits of Huang's Asylum Petition*

While the BIA was free to disagree with the IJ as to whether the evidence showed that Huang had an objectionably reasonable well-founded fear, it could only do so if, as noted above, it considered the record as a whole. Unfortunately, the BIA's opinion does not reflect that type of consideration. In granting asylum, the IJ relied on the 2007 State Department letter. That letter indicates that U.S. officials know of no policy at the national or provincial level that "mandat[es] the sterilization of one partner of couples that have given birth to two children[,]" and that, to the extent an unwritten practice of sterilization exists, Chinese citizens may be able to avoid it by either paying social compensation fees or by choosing not to register their children as members of their household. (*Id.* at 1353.) However, the letter says nothing about whether local family-planning policies require sterilization, and Huang submitted a 2003 administrative decision issued by the FDFPA that contradicts what was said in the 2007 State Department letter. According to that decision, a child born outside of China to Chinese parents who do not have permanent residency in the child's country of birth "shall be treated as a Chinese national and citizen for ... domestic administrative purposes," including enforcement of Fujian family-planning regulations. (*Id.* at 1895.) Even the 2007 State Department letter states that, "[a]lthough Chinese officials assert that national laws and policy and provincial regulations do no permit forced abortions or sterilizations, there is evidence that they have taken place." (*Id.*)

30

There is additional evidence from the State Department to corroborate that finding. For example, according the 2007 Asylum Profile, the State Department had received reports of compulsory sterilizations in Fujian Province as recently as 2006. The 2006 Country Report confirms that, as of 2006, reports of forced sterilizations in derogation of the national policy continued to emanate from Fujian Province. In Fujian and elsewhere, according to the report, parents of two children commonly faced extreme psychological and economic pressure to be sterilized, "sometimes [leaving] women with little practical choice but to undergo abortion or sterilization." (R. at 966.)

Yet the BIA discussed none of that evidence, instead devoting its analysis to explaining why the lack of an express sterilization policy, Huang's lack of individualized evidence, her in-laws' letter, and the affidavit from the Chinese citizen who fathered two children in Japan were insufficient to establish an objectively reasonable fear of persecution. The BIA simply failed to address any evidence that, if credited, would lend support to Huang's asserted fear of sterilization, and thus the decision does not reflect a consideration of the record as a whole. While we are not suggesting that the BIA must discuss every piece of evidence mentioned by an asylum applicant, it may not ignore evidence favorable to the alien, particularly when, as here, the alien's administrative brief expressly calls the BIA's attention to it. *See Espinosa-Cortez*, 607 F.3d at 107 ("[T]he BIA is not permitted simply to ignore or misconstrue evidence in the asylum applicant's favor.").

The BIA's analysis does little more than cherry-pick a few pieces of evidence, state why that evidence does not support

a well-founded fear of persecution, and conclude that Huang's asylum petition therefore lacks merit. That is selective rather than plenary review. "Plenary" means "full; complete; entire," BLACK'S LAW DICTIONARY (9th ed. 2009), and with the power to conduct plenary review goes the responsibility to conduct it. The BIA must provide sufficient analysis to demonstrate that it has truly performed a full review of the record, including the evidence that may support the alien's asylum claim.[10] *See Toussaint v. Att'y Gen.*, 455 F.3d 409, 414 (3d Cir. 2006) (requiring the BIA to perform an analysis of sufficient depth to permit meaningful appellate review of its reasoning). Because the BIA's decision does not indicate that such a review took place in Huang's case, we will grant the petition for review, vacate the final order of removal entered by the BIA, and remand for further proceedings.

----

[10]Huang claims that the BIA erred in denying her request for withholding of removal, for the same reasons that she appeals its asylum disposition. The substantive elements for obtaining withholding are the same as for asylum, except that the alien must prove by a preponderance of the evidence, rather by a reasonable probability, that he will be persecuted based on a statutorily protected ground if he is repatriated. *Lukwago v. Ashcroft*, 329 F.3d 157, 182 (3d Cir. 2003). Because the BIA performed an inadequate asylum analysis and did not independently assess Huang's right to withholding of removal, we cannot meaningfully address withholding of removal beyond what is pertinent from our analysis of the asylum claim. We will therefore remand Huang's withholding claim for further consideration in light of this opinion.

We note one final concern with respect to the merits. The way that the BIA approached its analysis—selecting only those pieces of evidence that cast doubt on the likelihood of Huang's being sterilized—suggests that the BIA was concerned with whether Huang had demonstrated that forced sterilization is more likely than not to occur if she is repatriated, when it should instead have been assessing whether there was a reasonable possibility of forced sterilization and whether her fear was objectively reasonable, and thus well founded. In *Cardoza-Fonseca*, the Supreme Court, cautioning that the fact that the fear must be "well-founded" does not "transform the standard into a 'more likely than not' one," cited the example of well-founded fear given by a "leading authority":

> Let us . . . presume that it is known that in the applicant's country of origin every tenth adult male person is either put to death or sent to some remote labor camp. . . . In such a case it would be only too apparent that anyone who has managed to escape from the country in question will have "well-founded fear of being persecuted" upon his eventual return.

480 U.S. at 431 (quoting 1 A. Grahl-Madsen, The Status of Refugees in International Law 180 (1966)). The BIA should be mindful of this distinction in considering the evidence anew on remand.[11]

---

[11]The BIA, of course, is not prevented from opening other avenues of inquiry, if it chooses to remand the case to the IJ.

B.      *Motion to Remand*

Huang also argues that the BIA abused its discretion in denying her motion to remand for consideration of her new evidence. The BIA treats a motion to remand for the purpose of submitting additional evidence in the same manner as motions to reopen the record. *See* 8 C.F.R. § 1003.2(c)(4); *In re Coelho*, 20 I. & N. Dec. 464, 471 (B.I.A. 1992) ("[W]here a motion to remand is really in the nature of a motion to reopen or a motion to reconsider, it must comply with the substantive requirements for such motions."). The alien must show that the "evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1). The BIA may deny a motion to reopen if it determines that "(1) the alien has not established a prima facie case for the relief sought; (2) the alien 'has not introduced previously unavailable, material evidence'; or (3) in the case of discretionary relief (such as asylum), the alien would not be entitled to relief even if the motion was granted." *Caushi v. Att'y Gen.*, 436 F.3d 220, 231 (3d Cir. 2006) (quoting *INS v. Abudu*, 485 U.S. 94, 104-05 (1988)). To establish a prima facie case for asylum, the alien must produce objective evidence that, when considered together with the evidence of record, shows a reasonable likelihood that he is entitled to relief. *Guo v. Ashcroft*, 386 F.3d 556, 563 & n.7 (3d Cir. 2004). The BIA "must actually consider the evidence and argument that a party presents" and may not summarily dismiss the motion. *Zheng v. Att'y Gen.*, 549 F.3d 260, 266 (3d Cir. 2008) (quoting *Abdulai v. Ashcroft*, 239 F.3d 542, 549 (3d Cir. 2001)). We review the denial of a motion to remand or to reopen for abuse of discretion, and "will uphold that determination if it is 'supported

34

by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)).

Huang seeks remand for the IJ to consider the following new evidence:

(1)     Chinese passports and travel documents for her two children.

(2)     Family-planning propaganda, including posters and a 2006 desk-calendar issued by authorities in Lang Qi, Fujian Province, describing family-planning policies, none of which state that sterilization is mandatory after two births.

(3)     A report from DHS following an investigative officer's attempts to authenticate certain documents describing birth control polices in Fujian Province.   The report identifies the following documents as authentic:

(3a)     Two documents issued by the FDFPA dated January 17, 2007, indicating that the foreign-born children of Chinese citizens are not counted under the family-planning policy unless they are registered as permanent residents of China.

35

(3b) A printout from the website of the National Family Planning Commission, stating that "Returned Overseas Chinese are not allowed to have another child, provided that they have already given birth to two or more children abroad."

(3c) Two administrative decisions issued in 2003 by the FDFPA and the Changle City Family Planning, which state that Chinese citizens who give birth abroad will be subject to enforcement of family-planning regulations once they return home unless they qualified as permanent residents of the nation in which their children were born at the time the birth occurred.

(3d) The July 1999 poster describing birth-control policies in Changle City.

(4) An affidavit dated November 15, 2007 from Huang's mother-in-law, Li Ping Ye, stating that birth control authorities informed her that Huang will be required to undergo a sterilization procedure if she returns to Fuzhou.

(5) A document purporting to be an official certification issued by Fuzhou family-planning

36

authorities indicating that Huang will be sterilized if she returns to Fuzhou.

(6)     A statement dated September 2, 2004, from the Fujian Foreign Affairs Office in response to a U.S. State Department inquiry indicating that Fujian family-planning policies were amended in 2002, and that, since then, there has been no official policy mandating sterilization.

The BIA refused to consider all of this new evidence on the grounds that it did not qualify as new or material because it was available at the time of the hearing and was cumulative of other evidence of record.

We conclude that the BIA properly denied Huang's motion to remand with respect to all of the newly submitted evidence except the certification purportedly issued by Fuzhou family-planning authorities (Item 5). Much of the supposedly new evidence was either within Huang's control at the time of the IJ proceedings or is duplicative of other parts of the record. *See In re O-S-G-*, 24 I. & N. 56, 60 (B.I.A. 2006) (rejecting a motion to reconsider because it merely reiterated facts and arguments already in the record). The passport and travel documents (Item 1) belonging to Huang's son were in her possession at the time of the IJ proceedings, and, while she did not obtain a passport for her daughter until six months after the IJ issued his decision, she offered the passports only to show that her children qualify as Chinese citizens, a fact that the government has never disputed. Both of the 2003 administrative

37

decisions (Item 3c) as well as the Changle City poster (Item 3d) are not new because they were actually submitted to the IJ prior to the hearing on Huang's petition. The September 2, 2004 statement from the Fujian Foreign Affairs Office (Item 6), which states that China has no official policy requiring sterilization, and the documents from the FDFPA dated January 17, 2007 (Item 3a), which explain that foreign-born children are not counted under provincial birth control policy, merely reiterate what other documents in the record have stated. The website (Item 3b) indicating that Chinese citizens returning from abroad may not have children in China if they already have two children is also redundant of other record materials, and the content of Li Ping Ye's affidavit (Item 4) duplicates the in-laws' letter that was submitted to the IJ. The family-planning propaganda (Item 2) is not duplicative of other items in the record, and it may not have been in Huang's possession before, but it contains no reference to mandatory sterilization and therefore has no significant bearing on her asylum rights.

However, the BIA should have given more thorough consideration to the motion to remand based on the certification (Item 5) supposedly issued by Fuzhou family-planning authorities. That document, which is dated November 15, 2007, was unavailable when the IJ granted Huang asylum in April 2007, and, unlike any other evidence in the record, it purports to be an official proclamation that Huang will be required to undergo a sterilization procedure if she returns to China. The document says it is issued by family-planning authorities in her husband's hometown of Fuzhou, a city with which she has family connections and where she may return once she re-enters China. The BIA's own decision reversing the IJ's grant of

asylum underscores the potential importance of the document, because that decision faulted Huang for failing to produce "individualized evidence showing that [she] has reason to fear being singled out for persecution." (R. at 5.) Thus, at least on its face, the certification appears to provide precisely the type of evidence that might alter the BIA's calculus when reviewing Huang's petition. If authentic,[12] the certification would thus constitute new, material evidence that birth-control authorities in the city where Huang's family resides may target her for sterilization, if she returns to the jurisdiction within their enforcement authority. The BIA's dismissive treatment of the certification was inappropriate. *See In re J-S-*, 24 I. & N. Dec. 520, 539 (Att'y Gen. 2008) (indicating that asylum is available to individuals who have either been sterilized "or specifically threatened with such measures" (citation omitted)); *accord Shao v. Mukasey*, 546 F.3d 138, 156 (2d Cir. 2008) (observing that "some Chinese nationals with two or more children might be able to demonstrate a well-founded fear of future forced sterilization based on general population control policies without any evidence of past persecution or threats of persecution to themselves as individuals").

----

[12]The authenticity of the certification may well be open to question, and that question will require more than speculation to answer. *See Lin v. Gonzales*, 445 F.3d 127, 134 (2d Cir. 2006) (stating that the "conclusion that a petitioner's documents were fraudulent must be based on more than speculation and conjecture"). It appears, however, that numerous undisputedly authentic documents contradict the certification. However, authenticity is not for us to address in the first instance.

Accordingly, we will vacate the BIA's denial of the motion to remand with respect to the certification and will instruct the BIA to reconsider the motion as to that evidence. We express no opinion regarding the merit of the motion.

## IV.    Conclusion

We will vacate the BIA's order of removal and remand Huang's asylum petition to the BIA for consideration in accordance with this opinion. When considering the petition on remand, the BIA must also evaluate whether to reopen the record to permit further consideration of the purported certification from Fuzhou family-planning authorities indicating that Huang will be sterilized if she returns to China.