**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3063
_____

V. E. E-O.; A. M. V-E.,
                    Petitioners

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA
_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Nos. A208-378-441 & A208-378-440)
Immigration Judge:  Steven A. Morley

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 9, 2019

Before:  CHAGARES, JORDAN, and RESTREPO, Circuit Judges.

(Filed: October 11,2019)

_____

OPINION[*]
_____

CHAGARES, Circuit Judge.

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

V. E. E-O. and A. M. V-E.[1] petition for review of an order of the Board of Immigration Appeals ("BIA") affirming the denial of their applications for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). For the following reasons, we will deny their petition.

I.

E-O. is a native and citizen of Honduras. In August 2015, she and her minor daughter, V-E., entered the United States without valid documentation. The Department of Homeland Security initiated removal proceedings, charging them with removability under § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act. E-O. conceded their removability, but sought asylum, withholding of removal, and protection under the CAT.

The Immigration Judge ("IJ") held a hearing in April 2017. There, the IJ heard testimony from Rosa Maria Sanchez-Figueroa. Sanchez-Figueroa testified that she loved and treated E-O. like a daughter. Back in Honduras, they were neighbors who shopped together, attended church together, and celebrated Mother's Day together. Sanchez-Figueroa also helped care for E-O.'s daughter when she was born. Indeed, as E-O. would testify, the two saw each other almost every day.

Sanchez-Figueroa testified that, in 2011, her son Edis became the target of a gang after he stopped gang members from mugging an elderly woman on Easter. She testified that one night in June 2011 fifteen gang members came to the Sanchez-Figueroa home looking for Edis. The gang members attacked the family with machetes, seriously

---

[1] Consistent with our order of October 5, 2018, we identify both petitioners by their initials.

2

injuring Edis and Sanchez-Figueroa's partner, Elvis. Nobody came to help — except E-O. As E-O. would later testify, doing so put her at risk and terrified her. Nonetheless, she helped get Edis and Elvis to a hospital. Edis survived the attack, but Elvis died from his injuries.

A couple of months later, the gang eventually caught up with Edis. Sanchez-Figueroa testified that, one day, Edis was running an errand when some men playing cards asked him for directions. They then shot him to death.

The gang continued to target Sanchez-Figueroa. She testified that they set her step-father's car on fire outside her mother's house. Sanchez-Figueroa also testified that a woman showed up and told her that "[y]our family will be killed by bullets or set on fire." AR 232. And, Sanchez-Figueroa testified, a man with a rock would sit outside her mother's house — where she was staying — and follow her when she left. The threats were not limited to her; she testified that her sister was interrogated.

Sanchez-Figueroa fled to the United States in December 2011. But she testified that her mother's house (where her four sisters and their families also live) is still under watch — a man in a black car frequently drives by the house, rolling down the window every time he passes.

Which brings us back to E-O. She testified that in January 2015, over three years after Sanchez-Figueroa left Honduras, she began receiving threats. A man called her on the phone and said to watch out. A few days later, that same man showed up at her house, threatening her and her daughter. He told them "to be really careful." AR 263. Other men, too, started standing near her house. E-O. testified that she believes all the

men were gang members. And she testified that she believes she was targeted because she had assisted Sanchez-Figueroa, even though it had been more than three years since Sanchez-Figueroa had left the country. So in July 2015, E-O. and her daughter left Honduras for the United States.

The IJ also heard testimony from an expert, who attempted to elucidate why E-O. only started receiving threats in 2015. The expert explained that ever since Honduran President Juan Orlando Hernández took office in January 2014, authorities have been looking or re-looking into police murders. As it happened, two officers who had been investigating the attacks on the Sanchez-Figueroa family had been murdered. The expert opined that the gang threatened E-O. because it was worried she could be a witness in any investigation of the officers' deaths.

After assessing all the testimony, as well as affidavits, country reports, and other documentary evidence, the IJ found that E-O.'s testimony was credible and corroborated by the record. The IJ specifically found that "evidence corroborates that the community viewed [E-O.] and Ms. Sanchez-Figueroa as family, and that she helped Ms. Sanchez-Figueroa when others were too frightened to do so." Appendix ("App.") 23. The IJ then considered whether E.O. was eligible for asylum. The IJ determined that E.O., through her membership in the Sanchez-Figueroa family, was part of a "particular social group." App. 26. The IJ further found that "members of [E-O.'s] community, including gang members, viewed [her] as family of Ms. Sanchez-Figueroa." Id. And the IJ even found that the evidence demonstrates that the gang in Honduras had "a clear animus against Ms. Sanchez-Figueroa and her family." App. 27.

4

But the IJ nonetheless rejected E-O.'s asylum claim because she had not demonstrated the necessary "nexus" between her "particular social group and the threats she experienced." App. 28. Observing the time lapse between Sanchez-Figueroa's leaving Honduras and E-O.'s receiving threats, the IJ determined that "[o]ther than speculation, there is no definitive connection linking the 2015 threats against [E-O.] to Ms. Sanchez-Figueroa." App. 27. The IJ also dismissed the expert's explanations as "conjecture piled upon guesswork." App. 27. Because E-O. had failed to demonstrate nexus, the IJ also denied E-O.'s application for withholding of removal and protection under CAT. For the same reasons, the IJ denied E-O.'s daughter's applications as well.

E-O. and her daughter appealed to the BIA, which dismissed the appeal. The BIA determined that the IJ did not clearly err in concluding that E.O. had failed "to establish the link between her fear of harm upon return to Honduras and her membership in a particular social group." App. 7. E-O. and her daughter now petition us to review the BIA's final order of removal.

## II.

We have jurisdiction under 8 U.S.C. § 1252(a)(1) to review the BIA's order. The BIA had jurisdiction to review the IJ's decision under 8 C.F.R. § 1003.1(b). We generally only consider the reasoning offered by the BIA, but because the BIA here adopted the IJ's findings and also discussed the bases of the IJ's decision, we can review both the BIA's and the IJ's decision. Saravia v. Att'y Gen., 905 F.3d 729, 734 (3d Cir. 2018).

5

We must uphold the BIA's factual determinations if they are "supported by substantial evidence from the record considered as a whole." Huang v. Att'y Gen., 620 F.3d 372, 379 (3d Cir. 2010). That means "we will reverse based on a factual error only if any reasonable fact-finder would be 'compelled to conclude otherwise.'" Id. (quoting 8 U.S.C. § 1252(b)(4)(B)). We review de novo any legal conclusions, though we defer to the BIA's "interpretation of statutes and regulations within its enforcement jurisdiction" under the standards articulated in Chevron v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), and Auer v. Robbins, 519 U.S. 452 (1997). Huang, 620 F.3d at 379; see also Kisor v. Wilkie, 139 S. Ct. 2400, 2410–18 (2019) (reaffirming Auer deference while clarifying its scope).

## III.

Applicants for asylum must demonstrate an inability or unwillingness to return to their home country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Accordingly, an asylum applicant must demonstrate a sufficient "nexus" between the persecution and the protected ground. Ndayshimiye v. Att'y Gen., 557 F.3d 124, 129 (3d Cir. 2009). The statute "makes motive critical" and requires an applicant to "provide some evidence of it, direct or circumstantial." I.N.S. v. Elias-Zacarias, 502 U.S. 478, 483 (1992) (emphasis omitted). Here, the IJ found that E-O. failed to establish nexus, and the BIA concluded that that finding was not clear error.

E-O. argues that the BIA erred in two principal respects. First, she argues that the BIA committed legal error by reviewing the IJ's nexus finding for clear error, instead of de novo. Second, she argues that, even under a clear-error standard, the BIA should not have affirmed the IJ's nexus determination. We are unpersuaded.

A.

Under 8 C.F.R. § 1003.1(d)(3), the BIA reviews de novo "questions of law, discretion, and judgment and all other issues." The Attorney General has explained that that standard extends to "application[s] of legal standards." Procedural Reforms to Improve Case Management, 67 Fed. Reg. 54,878, 54,890 (Aug. 26, 2002). An IJ's factual findings, however, are reviewed by the BIA only for clear error. Id.; see also Huang, 620 F.3d at 381.

We conclude that the IJ's nexus determination here was "purely factual in nature" and thus the BIA properly reviewed it for clear error. Huang, 620 F.3d at 383–84. The IJ's determination was, fundamentally, an assessment of any future persecutor's motive, which is an inherently factual inquiry. See Matter of L-E-A-, 27 I. & N. Dec. 40, 44 (BIA 2017) ("The question of a persecutor's motive will involve a particularized evaluation of the specific facts and evidence in an individual claim."), aff'd in relevant part by Matter of L-E-A-, 27 I. & N. Dec. 581, 581 (A.G. 2019). The Board has long held that view, see, e.g., Matter of N-M-, 25 I. & N. Dec. 526, 532 (BIA 2011), and we have already indicated our agreement with it, see Huang, 620 F.3d at 384 ("The factual part of the [well-founded fear] inquiry requires the IJ to evaluate . . . whether [the applicant] will be individually targeted based on a protected characteristic.").

7

Insisting that the BIA should have reviewed the nexus determination de novo, E-O. points us to the Attorney General's interpretation of 8 C.F.R. § 1003.1(d)(3), in which the Attorney General instructed that "whether the harm inflicted was 'on account of' a protected ground, [is a] question[] that will not be limited by the 'clearly erroneous' standard." Procedural Reforms to Improve Case Management, 67 Fed. Reg. at 54,890. But as E-O. acknowledges in her brief, the "on account of" inquiry can involve factual questions. See In Re J-B-N- & S-M-, 24 I. & N. Dec. 208, 214 (BIA 2007); E-O. Br. 24. And we are convinced that the IJ's nexus determination here was factual in nature. See Matter of A-B-, 27 I. & N. Dec. 316, 343 (A.G. 2018) (explaining that a persecutor's motivation "is a classic factual question" that the BIA cannot overturn unless "clearly erroneous" (quoting Zavaleta-Policiano v. Sessions, 873 F.3d 241, 247–48 (4th Cir. 2017))). The Attorney General's instruction thus did not compel de novo review in this case, and, consequently, we reject E-O.'s argument that the BIA's failure to address it was arbitrary and capricious.[2]

B.

Having confirmed that the BIA correctly reviewed the IJ's nexus finding for clear error, we now consider E-O.'s alternative argument — that the IJ clearly erred in finding no nexus. The BIA, however, found that the IJ's nexus determination was not clearly erroneous. We cannot disturb that finding so long as substantial evidence supports it.

---

[2] E-O. also argues that the BIA must review an IJ's nexus determination de novo because it incorporates a reasonable person standard. But this argument conflates the independent elements of nexus and fear of persecution, the latter of which involves an objective-reasonableness standard. See Huang, 620 F.3d at 384–85.

See Huang v. Att'y Gen., 620 F.3d at 379. And here, the BIA's decision to uphold the IJ's nexus determination was supported by substantial evidence.

The BIA observed, as did the IJ, that over three years passed between Sanchez-Figueroa's leaving Honduras and E-O.'s receiving any threats. The BIA and the IJ also observed that the men who threatened E-O. never mentioned Sanchez-Figueroa, and they reasonably concluded that any evidence connecting those threats to E-O.'s membership in the Sanchez-Figueroa family was tenuous at best. And it was not clear error for the IJ to discount the expert's testimony as too speculative. Given the time lag between Sanchez-Figueroa's leaving Honduras and E-O.'s receiving threats, as well as the lack of evidence tying those threats to E-O.'s membership in the Sanchez-Figueroa family, the record supports with substantial evidence the I.J's finding that there was insufficient proof.

E-O. argues that the IJ's factual findings were "internally inconsistent." E-O. Br. 38. Specifically, E-O. contends that once the IJ found (a) that the gang had a clear animus against the Sanchez-Figueroa family, and (b) that E-O. was viewed as part of that family, it had to find a nexus. But assessing a future persecutor's motive involves "a particularized evaluation of the specific facts and evidence in an individual claim." Matter of L-E-A-, 27 I. & N. Dec. at 44. Given that more than three years passed before E-O. received any threats, and that E-O. has not shown that she has ever been threatened because of her connection to Sanchez-Figueroa, we cannot conclude on this record that substantial evidence was lacking for the IJ's in finding no nexus.[3]

---

[3] Finally, E-O.'s reliance on Salgado-Sosa v. Sessions, 882 F.3d 451 (4th Cir. 2018), is misplaced. There, "the record manifestly establishe[d] that [the gang]

9

IV.

For the foregoing reasons, we will deny the petition for review.

---

threatened [the applicant] 'on account of' his [family connection]." Id. at 457.  Here, by contrast, there was no conclusive evidence that the gang threatened E-O. because of her relationship with the Sanchez-Figueroa family.