

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-19-2007

# Shardar v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 06-1238

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Shardar v. Atty Gen USA" (2007). *2007 Decisions.* Paper 331.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/331

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-1238

MOHAMMAD ARIF SHARDAR,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

On Petition for Review of an Order of
The Board of Immigration Appeals
Immigration Judge: Honorable Annie S. Garcy
(No. A72-779-408)

Argued July 10, 2007

Before: RENDELL and AMBRO, <u>Circuit Judges,</u>
SHAPIRO,* <u>District Judge</u>

(Opinion filed:  September 19, 2007)

Alan M. Strauss, Esquire (Argued)
Law Office of Stanley H. Wallenstein
41–43 Beekman Street, 3rd Floor
New York, NY 10038
        Counsel for Petitioner

Peter D. Keisler
    Assistant Attorney General
    Civil Division
Alison M. Igoe
    Senior Litigation Counsel
Richard M. Evans, Esquire
Joan E. Smiley, Esquire
Lyle D. Jentzer, Esquire (Argued)
Ada E. Bosque, Esquire
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044

        Counsel for Respondent

---

*Honorable Norma L. Shapiro, Senior District Judge for
the Eastern District of Pennsylvania, sitting by designation.

---
OPINION OF THE COURT
---

AMBRO, <u>Circuit Judge</u>

Mohammad Arif Shardar seeks review of an order of the Board of Immigration Appeals ("Board" or "BIA") denying his motion to reopen removal proceedings. Because we conclude that the Board abused its discretion in denying the motion, we grant the petition for review and remand with instructions to reopen the proceedings.

## I. Factual and Procedural Background

Shardar is a native of Bangladesh. He became a member, and later a local leader, of the Jatiya Party. That political party was formed by Army Chief of Staff General H.M. Ershad, who seized power in a bloodless coup d'état in 1983 and ruled Bangladesh until he was forced to resign in December 1990. In 1989, Shardar became Secretary of the Jatiya Party in Demra, a suburb of the capital, Dhaka. In the wake of Ershad's resignation, there was violence directed against those associated with Ershad and the Jatiya Party. In Demra, Jatiya Party headquarters were ransacked by members of rival political factions and Shardar's life was threatened. One of the rival political parties, the Bangladesh Nationalist Party (BNP), won national elections in February 1991.

3

In January 1992, Shardar participated in a political demonstration in support of the Jatiya Party in Jatrabari Square in Demra. During the demonstration, police dispersed the crowd with tear gas and arrested Shardar and three others. Shardar was charged with having weapons and explosives, but he testified in removal proceedings that the demonstration was peaceful and that the allegations against him were false.[1]  Following his

_____

[1] The following is the police report version of the incident:

> [T]hey were delivering defamatory, detractive and slanderous slowgans [sic] against the present Gov[ernmen]t . . . . We then and there made an importunate [sic] entreaty to them not to deliver such types of slowgans[,] for which they got infuriated and[,] being armed with deadly weapons[,] made a sudden invasion on us. They exploded some bombs at the spot one after another. Many padestrians [sic] were lethally injured.  We[,] to control this predicament [sic] situation [,] used tear gas to disperse them but they became more furious and begun [sic] to throw brickbats on us. We[,] having found no other way[,] advanced with fortitute [sic] to arrest them and Md. Arif Sardar [sic] accused No. 1 arrested by us, under whose Leadership this occurrence was occurred and the other skedaddled from the spot . . . .  All the

4

arrest, Shardar testified that he was severely beaten by police. The police struck him with canes and kicked him. They also told him that "Ershad time is over. Now is . . . BNP time." App. at A330. While in custody, Shardar was forced to confess to the charges against him and to renounce the Jatiya Party in order to stop the beating and save his life. After three days in the police station and six days in a jail, Shardar appeared before a judge and was released on bail. He was then taken by his father to a private medical clinic for nine days to receive treatment for the injuries he sustained while in police custody.

Fearful of further police brutality and not confident in his ability to get a fair trial, Shardar evaded the police who came looking for him on several occasions. Eventually, a warrant was issued for his arrest because of his failure to attend a hearing. When the police discovered that he was hiding at a friend's house, Shardar decided to flee the country and procured a false passport. He entered the United States in August 1992 and filed an affirmative application for asylum in November of that year.

After initially denying his asylum claim, the Government began removal proceedings; Shardar requested asylum relief and

---

accuseds [sic] are the members of Jatiyo [sic] Party, they are hideous, ferocious, turbulent, rampant and recalcitrant in nature.

App. at A441–42.

5

withholding of removal. A hearing was held before an Immigration Judge in February 1998, at which Shardar testified and presented evidence. In July 1998, the IJ denied his claim for asylum and for withholding of removal but allowed him to depart the United States voluntarily. The IJ found Shardar credible ("The respondent testified extremely credibly with regard to his incarceration and the beatings that he suffered."), and specifically credited his testimony regarding the beatings he had received at the hands of the police.

Nevertheless, while conceding that Shardar could arguably show past persecution, the IJ rejected his asylum claim after concluding that he had not shown that his arrest was pretextual or that he could not receive justice in the Bangladeshi courts. The IJ insisted that Shardar feared prosecution, not persecution. In rejecting Shardar's contentions, the IJ specifically relied on a 1997 State Department report, which stated that Jatiya Party members who had been harassed by the BNP "were able to defend themselves in court actions and have the same judicial rights as other Bangladeshis." App. at 419. Without some evidence that the judicial system was corrupt, the IJ concluded that Shardar could not sustain his burden of showing a well-founded fear of persecution.

In August 1998, Shardar appealed the IJ's decision to the Board, and on June 25, 1999, he moved to reopen removal proceedings in order to seek relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or

Degrading Treatment or Punishment (CAT), Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988), 1465 U.N.T.S. 85.  The Board affirmed the IJ's decision and denied his motion to reopen in March 2003, stating that it had "no reason to conclude that the prosecution [Shardar] may face if he returns to Bangladesh is politically motivated, and there is no reason to find that he would be unable to establish his claimed innocence."  Shardar petitioned for review of the Board's decision in our Court and, based on the record before us at that time, we denied that petition in August 2004.  *Shardar v. Ashcroft*, 382 F.3d 318 (3d Cir. 2004).

Following our Court's denial of his petition for review, Shardar filed a motion before the Board in October 2004 to reopen his removal proceedings based on changed country conditions and new evidence.  Specifically, Shardar presented evidence that the re-emergence of the BNP as the ruling party in Bangladesh in 2001[2] represented a change in country condition

_____

[2] Although not part of the record before us, we note that it has been reported in the press that in November 2006 the BNP's term as ruling party ended.  *See, e.g.*, Somini Sengupta, *Bangladesh Says It Won't Let an Ex-Leader Re-enter the Country*, N.Y. Times, Apr. 19, 2007, at A4.  Although parliamentary elections were scheduled for January 2007, the interim caretaker government backed by the army has postponed elections under emergency powers.  *Id.*  This does not affect our review of the Board's decision but, of course, these and other developments in Bangladeshi politics will need to be considered

7

and that his position as a former local leader of the Jatiya Party made it likely that he would be persecuted if returned to Bangladesh. The Board denied his motion to reopen in a three-paragraph order, which concluded that Shardar had "not adequately demonstrated that his situation is appreciably different from the dangers faced by all his countrymen," and that he had "failed to establish [that] materially changed country conditions exist in Bangladesh."[3] Shardar filed a timely petition for review of the Board's order.

## II. Jurisdiction and Standard of Review

The BIA has jurisdiction over motions to reopen removal proceedings under 8 C.F.R. § 1003.2(a). Our Court has jurisdiction over Shardar's petition for review under 8 U.S.C. § 1252. *Cruz v. Att'y Gen.*, 452 F.3d 240, 246 (3d Cir. 2006) ("Congress has explicitly granted federal courts the power to review 'any final order of removal' under 8 U.S.C. § 1252(a)(1). Implicit in this jurisdictional grant is the authority to review the denial of a motion to reopen any such final order.").

"We review the BIA's denial of a motion to reopen for abuse of discretion . . . and review its underlying factual

upon reopening the removal proceedings.

[3] The Board's order is dated February 2005. However, it reissued the order in December 2005 because of an "error in administrative processing."

8

findings related to the motion for substantial evidence." *Filja v. Gonzales*, 447 F.3d 241, 251 (3d Cir. 2006) (internal citation omitted). Its "denial of a motion to reopen may only be reversed if it is 'arbitrary, irrational, or contrary to law.'" *Id.* (quoting *Sevovian v. Ashcroft*, 290 F.3d 166, 174 (3d Cir. 2002)).

## III.  Discussion

### A.  Introduction

The resolution of this appeal turns on two related but analytically distinct issues: (1) whether Shardar has presented evidence of changed country conditions sufficient to allow him to file a motion to reopen more than 90 days after the Board rejected his claims; and (2) whether the new evidence Shardar has presented and the prior evidence in the record together show that he has a reasonable likelihood of prevailing on his asylum claim, *i.e.*, whether he has presented a *prima facie* case for asylum.[4]  The first is a threshold question: does the new evidence show a change in country conditions that would allow the motion to reopen to be brought?  The second then asks a question about the merits: does the new and the old evidence together make out a *prima facie* case for asylum?  We conclude

---

[4]  Although Shardar seeks, in addition to asylum, withholding of removal and CAT relief in his motion to reopen, because we conclude that he has made a *prima facie* case for asylum, we need not deal with these forms of alternative relief.

that the decision of the Board answering no to these two questions is both irrational and arbitrary; thus it abused its discretion. Furthermore, to the extent the Board's decision is grounded in a factual finding that Shardar's "situation" is not "appreciably different from the dangers faced by all his countrymen," that finding is not supported by substantial evidence.

## B.     Governing Legal Standards

### 1.     Asylum

Under 8 U.S.C. § 1158(b), the Attorney General may grant asylum to an alien who is a "refugee." A "refugee" is defined as

> any person who is outside any country of such person's nationality . . . who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C.A. § 1101(a)(42)(A). "An applicant bears the burden of proving eligibility for asylum based on specific facts and credible testimony." *Guo v. Ashcroft*, 386 F.3d 556, 561 (3d

10

Cir. 2004). A well-founded fear of persecution is the key to eligibility. 8 C.F.R. § 208.13(b). Persecution includes "'threats to life, confinement, torture, and economic restrictions so severe that they constitute a real threat to life or freedom.'" *Lukwago v. Ashcroft*, 329 F.3d 157, 168 (3d Cir. 2003) (quoting *Lin v. INS*, 238 F.3d 239, 244 (3d Cir. 2001)). "The persecution must be committed by the government or forces the government is unable or unwilling to control." *Vente v. Gonzales*, 415 F.3d 296, 300 (3d Cir. 2005) (internal quotation marks omitted). To qualify for asylum, the applicant must show that the persecution is on account of one of the statutorily recognized grounds, *i.e.*, race, religion, nationality, membership in a particular social group, or political opinion. *Lukwago*, 329 F.3d at 167.

If an applicant demonstrates past persecution on account of a protected ground there is "a rebuttable presumption of a well-founded fear of future persecution, as long as that fear is related to the past persecution." *Id.* at 174; 8 C.F.R. § 208.13(b)(1). This presumption may only be rebutted if the Government proves by a preponderance of the evidence that: (1) "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution"; or (2) "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . and . . . it would be reasonable to expect the applicant to do so." 8 C.F.R. § 208.13(b)(1)(i).

An applicant who fails to demonstrate past persecution

11

may still qualify for asylum if he shows that he has a well-founded fear of future persecution on account of a protected ground. *Lukwago*, 329 F.3d at 174. A well-founded fear includes both a subjective and objective component. *Id.* at 175. "An applicant must 'show that he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility.'" *Id.* (quoting *Abdille v. Ashcroft*, 242 F.3d 477, 496 (3d Cir. 2001)); *see also* 8 C.F.R. § 208.13(b)(2)(i).

## 2.     *Motions to Reopen*

There are both procedural and substantive hurdles that must be overcome in a motion to reopen removal proceedings. Under the governing regulations, "an alien may file only one motion to reopen removal proceedings . . . and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered." 8 C.F.R. § 1003.2(c)(2). However, the "time and numerical limitations . . . shall not apply" to motions to reopen that "apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality . . . if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." § 1003.2(c)(3).     Therefore, if the asylum applicant presents material evidence of changed country conditions that could not have been presented during the hearing before the IJ, his motion can be considered, even if there has been a prior motion to

reopen or the motion is beyond the 90-day time limit for filing. *See Filja*, 447 F.3d at 251–54.

With regard to the substantive hurdle, "[a]s a general rule, motions to reopen are granted only under compelling circumstances." *Guo*, 386 F.3d at 561. The Board has held that in exercising its discretion to reopen proceedings "we have been willing to reopen where the new facts alleged, when coupled with the facts already of record, satisfy us that it would be worthwhile to develop the issues further at a plenary hearing on reopening." *In re L-O-G*, 21 I. & N. Dec. 413, 419, 1996 WL 403255 (BIA June 14, 1996) (internal quotation marks omitted). As noted, "[a] motion to reopen must establish *prima facie* eligibility for [the relief sought]." *Guo*, 386 F.3d at 563. In order to make a *prima facie* case, the applicant must "'produce objective evidence showing a "reasonable likelihood" that he can establish [that he is entitled to relief].'" *Id.* (quoting *Sevovian*, 290 F.3d at 175) (alteration in original). For an asylum claim, this "means merely showing a realistic chance that the petitioner can at a later time establish that asylum should be granted." *Id.* at 564. Facts presented in the motion to reopen are "accepted as true unless inherently unbelievable." *Bhasin v. Gonzales*, 423 F.3d 977, 987 (9th Cir. 2005). That said, the regulations provide that "[t]he Board has discretion to deny a motion to reopen even if the party moving has made out a prima facie case for relief." 8 C.F.R. § 1003.2(a). But while the Board has discretion to deny a motion to reopen notwithstanding a *prima facie* showing, when it denies a motion to reopen on the

13

ground that the applicant has failed to make a *prima facie* showing, we yet review that determination to ensure that it is supported by substantial evidence and is not an abuse of discretion. *Sevovian*, 290 F.3d at 174.

## C. Changed Country Conditions

Shardar brought his motion to reopen in October 2004, more than 90 days after the Board's "final administrative decision was rendered" in March 2003. Therefore, because his motion to reopen is untimely,[5] it must be "based on changed circumstances arising in the country of nationality" and be supported by new evidence that was not available during his hearing before the IJ. 8 C.F.R. § 1003.2(c)(3)(ii).

To show changed country conditions, Shardar presented evidence that since the BNP returned to power in 2001, the situation for Jatiya Party supporters has become more dangerous. When Shardar fled Bangladesh in 1992, the Jatiya Party, in which he had been a local leader, had recently lost power to the BNP. His beating by the police was a politically motivated action by BNP supporters against Shardar because of

---

[5] Shardar's motion to reopen is also his second, as he previously moved to reopen to seek relief under the CAT. In any event, whether because he is outside the 90-day time limit or because the motion is his second, he must show changed country conditions to bring his current motion to reopen. 8 C.F.R. § 1003.2(c)(2)-(3).

14

his association with the Jatiya Party. *See Shardar*, 382 F.3d at 324 ("The evidence indicates these beatings were politically motivated . . . ."). The BNP was in power in Bangladesh until 1996, at which time the Awami League became the ruling party. In October 2001, the BNP returned to power. It was during the time of the Awami League's rule, in 1998, that the IJ decided Shardar's asylum claim. Thus, the evidence of changed country conditions submitted by Shardar with his motion to reopen "was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. § 1003.2(c)(3)(ii).[6]

As part of his motion to reopen, Shardar submitted a detailed affidavit by Dr. John Adams, an expert in the society, politics, and economics of South Asian countries. The Government has not challenged Dr. Adams's qualifications or the reliability of his affidavit, which at this stage of the proceedings we must accept as true. The affidavit states that, while members of the Jatiya Party "remained under pressure" during the rule of the Awami League, the re-emergence of the BNP "caused a sharp change in country conditions, restoring the context from which the applicant fled, but in a form that is more intensive and predatory." App. at A67–68. The affidavit

---

[6]Although the BNP returned to power before the Board had decided Shardar's appeal, our Court has held that the hearing before the IJ is "the previous hearing" referenced in the regulatory requirement. *See Filja*, 447 F.3d at 252–54 (quoting 8 C.F.R. § 1003.2(c)(3)(ii)).

15

continued: "There is a consistent pattern of abuse of political rights and political persecution for holding the [Jatiya Party's] political opinions, perpetrated by the BNP, the police forces under its control, and the BNP's allies, including radical Islamist elements, which has intensified since October 2001, sufficiently to represent a change in country conditions." *Id.* at A67. As Dr. Adams notes, following the BNP's re-emergence "[t]he climate for parties in opposition to the government is becoming increasingly chilly in Bangladesh." *Id.* at A69. State Department documents cited in the Adams affidavit and reporting on conditions after the BNP's re-emergence state that "police employed excessive, sometimes lethal, force in dealing with opposition demonstrators, and the police routinely employed physical and psychological torture during arrests and interrogations." *Id.* at A71. In addition, criminal laws are frequently used as a pretext to punish and harass members of the political opposition. *Id.*

The re-emergence of the political party responsible for the applicant's prior persecution is the type of situation that would constitute a change in country conditions. *See Filja*, 447 F.3d at 255–56. In *Filja*, we rejected the Government's argument that the applicants' motion to reopen was not timely. Although not essential to our holding (which rejected the legal standard for timeliness applied by the Board), we suggested that the Filjas could likely demonstrate changed country conditions because, "[a]lthough at the time of the IJ hearing the Democratic Party was in power . . . [, w]hen in 1997 the Socialist Party

16

returned to power the position of those supporting the Democratic Party became more precarious." *Id.* at 256. Shardar's situation is analogous: while the BNP was not in power at the time of Shardar's hearing before the IJ, its re-emergence constitutes a material change in conditions for an individual like Shardar, who was previously beaten by the BNP-affiliated police force.

Indeed, the Board itself has agreed that the re-emergence of the BNP is a change in Bangladeshi country conditions for a member of the Jatiya Party seeking asylum. *In re Hossin*, A70 907 367 (BIA Jan. 27, 2003) (unpublished). It specifically concluded that "[c]onsidering the respondent's political affiliation [as a member of the Jatiya Party], the re-emergence of the BNP in Bangladesh would qualify as changed country circumstances warranting further review." *Id.* When Shardar cited this decision in his motion to reopen, the Board rejected its relevance, concluding (1) that as an unpublished opinion it was not precedential, and (2) that it was distinguishable because, unlike Shardar, Hossin had moved to reopen after initially abandoning his claim.

The Board's responses miss the mark. First, regardless whether the *Hossin* decision is precedential, by reaching an exactly contrary decision on a materially indistinguishable set of facts, the Board acted arbitrarily. As we recognized in *Cruz*, "[w]hile . . . unpublished BIA decisions . . . are not necessarily in the category of 'selected decisions . . . designated to serve as

17

precedents in all proceedings involving the same issue or issues,' 8 C.F.R. § 1003.1(g), agencies should not move away from their previous rulings without cogent explanations."  452 F.3d at 250; *see also Henry v. INS*, 74 F.3d 1, 6 (1st Cir. 1996) ("[A]dministrative agencies must apply the same basic rules to all similarly situated supplicants.").

Second, the Board's attempt to distinguish *Hossin* falls short.  That Hossin's initial asylum claim was denied because it was deemed abandoned, but that Shardar's initial asylum claim was denied on the merits, is of no relevance to whether the BNP's re-emergence constitutes a change in Bangladeshi country conditions for a Jatiya Party member who is seeking to reopen removal proceedings.  Both situations are materially indistinguishable regarding whether country conditions have changed.  Thus, we have little difficulty concluding that the Board acted arbitrarily and abused its discretion, as it offered no reasonable explanation for failing to follow its own decision.

Moreover, the Board abuses its discretion when it fails to "consider[] and appraise[] the material evidence before it." *Sevovian*, 290 F.3d at 177 (quoting *Tipu v. INS*, 20 F.3d 580, 583 (3d Cir. 1994)).  Here, the Board offered no explanation for not accepting the Adams affidavit concerning changed circumstances in Bangladesh.  The only explanation it provided for why Shardar's motion did not satisfy the regulatory requirements for filing a motion after the 90-day time limit is the following conclusory statement: "We further find that the

18

respondent has failed to establish [that] materially changed country conditions exist in Bangladesh to overcome the temporal limitations set forth in 8 C.F.R. § 1003.2(c)(2)." Without any explanation for *why* Shardar failed to overcome the "temporal limitations" in the regulations given the evidence he presented, the Board's conclusory handling of this issue was an abuse of discretion. *See Zhao v. Dep't of Justice*, 265 F.3d 83, 93 (2d Cir. 2001) ("An abuse of discretion may be found in those circumstances where the Board's decision provides no rational explanation, inexplicably departs from established policies, is devoid of any reasoning, or contains only summary or conclusory statements; that is to say, where the Board has acted in an arbitrary or capricious manner." (internal citations omitted)).

### D.     Eligibility for Asylum

#### 1.     *The Board's Decision*

The Board also rejected the merits of Shardar's motion to reopen in a similarly conclusory fashion: "Although the new evidence presented by the respondent continues to show that the current conditions in Bangladesh are turbulent, the respondent has not adequately demonstrated that his situation is appreciably different from the dangers faced by all his countrymen." This conclusion is puzzling. While it is correct that an asylum applicant must make a showing of a particularized threat of persecution, *see Kotasz v. INS*, 31 F.3d 847, 851–52 (9th Cir.

19

1996), Shardar presented significant evidence of just such a particularized threat.

First, the Adams affidavit repeatedly explained why Shardar's political beliefs and his position as a former local leader of the Jatiya Party would be likely to result in persecution by the BNP on that basis. It explained that following the BNP's rise to power in the early 1990s there were "countrywide attacks on identified [Jatiya Party] workers," as well as "[t]hreats and violence . . . directed at [Jatiya Party] activists and their families and properties." App. at A68. In addition, "local leaders and cadres [of the Jatiya Party] were increasingly exposed to threats and violence." *Id.* Since the decline of the Jatiya Party in the early 1990s, its members "have attempted to form opportunistic alliances with the BNP and AL [Awami League], but these have been fleeting and have not insulated local [Jatiya Party] workers from bullying, brutality, extortion and physical abuse." *Id.* at A70. Dr. Adams also stated that following the re-emergence of the BNP in 2001, "[u]se of the local courts, which are an administrative branch of the government, to harass [Jatiya Party] adherents remains common." *Id.* at A69. After chronicling several specific acts of BNP violence against members of the Jatiya Party since the BNP regained power in 2001, Dr. Adams concluded with the specific prospects for Shardar in the then-current climate in Bangladesh: "There is a high probability that the applicant's safety, person, and life will be in jeopardy should he be compelled to return to Bangladesh. Memories are long in Bangladesh and there is every reason to presume that, even after

20

a dozen years, the return of the applicant would lead to a resumption of previous threats and acts." *Id.* at A76–A77. The Adams affidavit is not simply evidence of general turbulence in Bangladesh; instead it provides a detailed, cogent, and reasoned explanation why Shardar would likely be the specific target of persecution because of his Jatiya Party affiliation.

Second, even more pertinent to the claim of particularized persecution, Shardar presented an affidavit from his brother in Bangladesh that stated that he (the brother) had been recently threatened with a gun and beaten by "BNP goons" for being a "collaborator of Jatiya Party," and that the perpetrators specifically asked about Shardar's whereabouts. *Id.* at A133. The brother's affidavit is further supported by a certification from a doctor who treated him and confirmed that he received wounds consistent with a beating. This evidence, which must be accepted as true at the motion-to-reopen stage, shows a significant likelihood that Shardar would be subjected to particularized persecution and does not simply concern itself with general country conditions. Indeed, it is hard to believe that a more particularized showing could be made: the brother's affidavit stated that individuals associated with the BNP had targeted Shardar's family members for persecution because of their association with the Jatiya Party, and these individuals had made a specific inquiry about Shardar.

The Board's conclusion that Shardar had not "adequately demonstrated that his situation is appreciably different from the

21

dangers faced by all his countrymen" ignores or misconstrues the evidence that Shardar presented, and thus constitutes an abuse of discretion. *See Sevovian*, 290 F.3d at 177. We previously rejected a similar attempt by the Board in *Vente* to misconstrue an asylum seeker's application. The Board rested its rejection of Vente's asylum claim on a finding that "the general unrest in Columbia did not provide a basis for asylum." *Vente*, 415 F.3d at 301. We noted that "the record clearly shows that Vente's asylum claim is based not on allegations of general social unrest in Columbia but on the specific threats that he received." *Id.* As such, we vacated and remanded the case to the Board, noting that "the BIA's findings . . . are wholly unsupported by the record and essentially ignore the actual basis of Vente's asylum claim." *Id.* at 302. Likewise, the Board's denial of Shardar's motion to reopen "essentially ignore[s] the actual basis of [his] asylum claim." *Id.* While it is true that "[t]he Board 'is not required to write an exegesis on every contention,'" it must "show that it has reviewed the record and grasped the movant's claims." *Sevovian*, 290 F.3d at 178 (quoting *Mansour v. INS*, 230 F.3d 902, 908 (7th Cir. 2000)). It has not shown that here. By ignoring the evidence that Shardar presented of the likelihood of particularized persecution and by misconstruing his claims, the Board abused its discretion.

Moreover, to the extent the Board's conclusion rests on a factual finding that Shardar's "situation" is not "appreciably different from the dangers faced by all his countrymen," that

22

finding is wholly unsupported by the record. We will uphold the Board's factual findings that are "supported by 'reasonable, substantial, and probative evidence on the record considered as a whole.'" *Chavarria v. Gonzalez*, 446 F.3d 508, 515 (3d Cir. 2006) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). But "[w]e will not accord the BIA deference where its 'findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record.'" *Id.* (quoting *Dia v. Ashcroft*, 353 F.3d 228, 249 (3d Cir. 2003)). Here, as already pointed out, the Board's finding that Shardar's situation is not appreciably different from all other Bangladeshis is not reasonably grounded in the record, which demonstrates a likelihood of particularized persecution because of his political affiliation. Thus, the Board's conclusion, which fails to address this relevant evidence, is not supported by substantial evidence.

## 2.      Prima Facie *Case*

When the evidence Shardar submitted is properly considered, there is little doubt that he has presented a *prima facie* case for asylum, *i.e.*, a reasonable likelihood that he is entitled to relief. As noted previously, when an applicant has shown past persecution, a well-founded fear of future persecution is presumed, absent a showing by the Government by a preponderance of the evidence that conditions have changed to make future persecution unlikely. *Lukwago*, 329 F.3d at 174. In this case, the IJ credited Shardar's testimony with regard to his being beaten by the police on account of his

political opinion and determined, albeit reluctantly, that he had likely demonstrated past persecution. The IJ concluded, however, that the Government had rebutted the presumption that Shardar had a well-founded fear of future persecution because conditions in Bangladesh had changed that allowed him to receive justice from the judicial system. The crux of the IJ's decision was that Shardar had not presented sufficient evidence to show that his criminal prosecution was pretextual and that his rights could not be adequately protected by Bangladeshi courts.

The new evidence Shardar presented in his motion to reopen went directly to what the IJ believed was the primary weakness in Shardar's case. Dr. Adams's affidavit states that the "benign viewpoint" expressed in State Department reports from 1997 and 1998, relied upon by the IJ for the conclusion that the Bangladeshi court system was capable of giving Shardar a fair trial, "was then, and is now, entirely inconsistent with scholarly or independent human rights assessments, and has been superseded by the Department of State's successor documents." App. at A70. Those superseding State Department documents and other sources noted by Dr. Adams indicated that the court system in Bangladesh is corrupt and that criminal laws are often used by authorities to oppress members of the political opposition. Indeed, according to the Adams affidavit, Transparency International has consistently ranked Bangladesh as the most corrupt country in the world since 2000. Dr. Adams summarized the situation this way:

24

> The local and middle tiers of the judiciary are highly corrupted and subject to influence and intimidation by government officials or by political activists. These judicial layers are governed by administrative appointment and judges at this level are highly attuned to the wishes of the party in power. . . . [I]t would be very improbable for the applicant to be in a position to depend upon the police or the courts for protection or remedy should he return to Bangladesh.

*Id.* at A72.

Given that the IJ denied Shardar's asylum claim primarily based on a conclusion that he could get a fair trial in Bangladesh, the Adams affidavit (the factual assertions in which must be taken as true), when taken together with the evidence already in the record, supports the conclusion that Shardar has made a *prima facie* case for asylum. Indeed, the cumulative evidence presented by Shardar demonstrates a reasonable likelihood "that he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." *Lukwago*, 329 F.3d at 175 (internal quotation marks omitted). The Board, which denied Shardar's motion to reopen because of a failure to establish a *prima facie* case, failed to assess and consider the relevant evidence before it. Under these circumstances, we conclude that the Board abused its

25

discretion.

Finally, given our conclusion that Shardar has presented a *prima facie* case for asylum and "in consideration of the already protracted history of the case," we conclude that it is appropriate to direct the Board to reopen the removal proceedings. *Fadiga v. Att'y Gen.*, 488 F.3d 142, 163 (3d Cir. 2007); *see also Malty v. Ashcroft*, 381 F.3d 942, 948 (9th Cir. 2004) (remanding with directions to reopen when the applicant had made a *prima facie* showing).

## VI. Conclusion

The Board abused its discretion in denying Shardar's motion to reopen his removal proceedings. Accordingly, we grant the petition for review and remand the case with directions to reopen the proceedings.