NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2090
_____

AMIR VANA,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
Respondent
_____

On Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
(BIA No. A078-492-675)
Immigration Judge: Hon. Rosalind Malloy
_____

Submitted Under Third Circuit LAR 34.1(a)
January 22, 2019

Before: JORDAN, KRAUSE, and ROTH, *Circuit Judges*

(Filed May 24, 2019)
_____

OPINION*
_____

_____

    * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does
not constitute binding precedent.

JORDAN, *Circuit Judge*.

Amir Vana petitions for review of the Bureau of Immigration Appeals ("BIA")'s denial of his motion to reopen. We will deny his petition in part and dismiss it in part for lack of jurisdiction.

## I.    BACKGROUND

This is not the first time that Vana has appeared before us. In 2009, we considered his petition for review of the order of removal in the proceedings he now seeks to reopen. *Vana v. Att'y Gen.*, 341 F. App'x 836, 836-39 (3d Cir. 2009) (per curiam). Accordingly, we start with the facts as laid out in our previous opinion:

> Vana is a citizen of Israel who entered the United States on a visitor's visa in 1993 and stayed beyond the six-month period. In June 2000, he was placed in removal proceedings. In December 2000, the immigration judge (IJ) found Vana removable for overstaying his visa, denied voluntary departure, and ordered him removed to Israel. In November 2000, during the pendency of his removal proceedings, Vana pled guilty to making false statements on a United States passport application, a violation of 18 U.S.C. § 1542; he was sentenced in 2001. During the pendency of his BIA appeal, Vana's wife, a United States citizen, filed an I–130 petition on Vana's behalf, which was approved. In 2002, the BIA granted Vana's motion to remand the removal proceedings for consideration of Vana's application for adjustment of status.

> On remand, the Government charged Vana with additional grounds of removability. After protracted proceedings that included an appeal to the Board and a remand to Immigration Court, the IJ determined that the Government had proved Vana's removability by clear and convincing evidence. Specifically, the IJ found that Vana had stayed in the United States beyond the time allowed by his visitor's visa and that he knowingly and willingly attempted to obtain a United States passport under a false name, a false birth date and place of birth (in the United States), and false social security number. The IJ pretermitted Vana's application for adjustment of status, finding that he was statutorily ineligible …. Vana appealed the denial of his request for adjustment of status; the BIA adopted and affirmed the IJ's decision. Vana filed a timely petition for review.

2

*Id.* at 837. We denied that petition. *Id.* at 837, 839.

Despite all of that, Vana was not removed, and, eight years later, he filed a motion with the BIA to reopen his removal proceedings. He did so to seek asylum, arguing that he would be perceived in Israel as having an Arab nationality, given his Yemeni heritage, and that he reasonably feared persecution on that ground. He alleged that his asylum claim was based upon changed country conditions in Israel arising after the IJ ordered him removed, rendering his motion timely. With his motion, Vana submitted a variety of documents, including his declaration and over 600 pages of country reports and similar evidence (the "country conditions evidence"). Vana also requested that the BIA reopen *sua sponte* on the grounds that he would be persecuted in Israel, that he has significant ties to the United States, and that his removal would work a severe hardship upon his wife and children, who are U.S. citizens.

The BIA denied the motion to reopen.[1] As to the asylum portion of the motion, it observed that Vana's motion was untimely unless he could proffer material evidence making out a "prima facie case for a grant of relief" and showing "changed circumstances arising in the country of nationality[.]" (A.R. at 3.) The BIA then denied the motion for three reasons. First, it said that Vana did "not establish … a prima facie asylum case" because "[t]here is no evidence that he faces an individualized risk of persecution"; "[t]he evidence (including incidents of violence) is insufficient to show a pattern or practice of persecution of Israeli citizens of imputed Arab nationality"; "Arab citizens are 20 percent

---

[1] The BIA also denied Vana's motion for a stay of removal, but that motion is not at issue here.

of Israel's population, meaning that more than 1 million live in Israel without persecution"; and "[r]eports of inequalities adversely affecting the Arab citizens are not shown to amount to persecution." (A.R. at 3-4.) Second, it determined that Vana had failed to show "materially changed country conditions in Israel" because he did "not make the required comparison of relevant country conditions or circumstances in Israel in 2006, the time of [his] hearing, with conditions at the time of filing the present motion to reopen." (A.R. at 4.) Third, it decided that "[r]eopening, even if otherwise warranted, would be denied in the exercise of discretion due to [Vana's] false claim of citizenship." (A.R. at 4.) As to the request to reopen *sua sponte*, the BIA ruled that no "exceptional situation" was present that would warrant reopening.[2] (A.R. at 4.)

Vana has timely petitioned for review.

## II. DISCUSSION[3]

In his petition, Vana contends that he made out a prima facie case of asylum eligibility, that he showed changed country conditions, and that there are exceptional circumstances that support *sua sponte* reopening. We conclude to the contrary that Vana has not made out a prima facie case of asylum eligibility and that we lack jurisdiction to

---

[2] The BIA also noted that Vana had not met the standards for reopening to seek withholding of removal or protection under the Convention Against Torture. To the extent that Vana sought such relief before the BIA, he does not challenge the BIA's conclusions, and we need not address them. *Garcia v. Att'y Gen.*, 665 F.3d 496, 502 (3d Cir. 2011).

[3] The BIA had jurisdiction under 8 C.F.R. § 1003.2(a). We have jurisdiction pursuant to 8 U.S.C. § 1252(a), except, as discussed below, as to the issue of *sua sponte* reopening.

4

review the BIA's decision not to reopen *sua sponte*. That resolves the case, so we need not address his remaining arguments.

First, as to Vana's challenge to the BIA's denial of his motion to reopen to seek asylum, we review such a denial for abuse of discretion, and "we give the BIA's decision broad deference and generally do not disturb it unless it is 'arbitrary, irrational, or contrary to law.'" *Lin v. Att'y Gen.*, 700 F.3d 683, 685 (3d Cir. 2012) (citation omitted). Our review of the factual findings underlying that decision, including whether the evidence is sufficient to support the elements of a prima facie case of eligibility for relief, is for substantial evidence. *Sevoian v. Ashcroft*, 290 F.3d 166, 174, 177 (3d Cir. 2002). "[W]e must uphold findings of fact unless the record evidence compels a contrary finding." *Yuan v. Att'y Gen.*, 642 F.3d 420, 425 (3d Cir. 2011).

"Although a motion to reopen 'must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened,' the 90-day limitation does not apply if the movant seeks reopening [to seek asylum] 'based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing.'"[4] *Zheng v. Att'y Gen.*, 549 F.3d 260, 265 (3d Cir. 2008) (citations omitted). That timing exception requires the movant to establish a prima facie case of eligibility for asylum. *Id.*

---

[4] Vana's motion undisputedly was filed outside the 90-day window.

Consequently, we first examine the standards governing eligibility for asylum and, next, what constitutes a prima facie case of asylum eligibility.

To qualify for asylum, an alien must establish "that [he] is 'unable or unwilling to return to, and is unable or unwilling to avail himself … of the protection of, [his] country because of [past] persecution or a well-founded fear of [future] persecution on account of[,]'" *inter alia*, nationality. *Garcia v. Att'y Gen.*, 665 F.3d 496, 503 (3d Cir. 2011) (citations omitted). Although there is no statutory definition of persecution, "we have explained that the term does not encompass all forms of unfair, unjust, discriminatory, or unlawful treatment[.]" *Huang v. Att'y Gen.*, 620 F.3d 372, 380 (3d Cir. 2010). Rather, "[p]ersecution 'is an extreme concept[,]'" *Jarbough v. Att'y Gen.*, 483 F.3d 184, 191 (3d Cir. 2007) (citation omitted), "cover[ing] only severe humanitarian mistreatment, such as 'death threats, involuntary confinement, torture,'" *Huang*, 620 F.3d at 380 (citation omitted), or "economic restrictions so severe that they constitute a real threat to life or freedom[,]" *Shardar v. Att'y Gen.*, 503 F.3d 308, 312 (3d Cir. 2007) (citation omitted). Furthermore, the acts at issue must be "committed by the government or forces the government is either unable or unwilling to control." *Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005) (citation and internal quotation marks omitted). A well-founded fear of persecution "include[s] both subjective and objective aspects[.]" *Huang*, 620 F.3d at 381. "The objective component of the analysis requires the alien to show that a reasonable person in his position would fear persecution, either because he 'would be individually singled out for persecution' or because 'there is a pattern or practice in his home country of persecution' against a group of which he is a member[,]" *id.* (citation omitted), i.e., a

group "similarly situated" to the alien that the alien has "establishe[d] his … own inclusion in, and identification with," 8 C.F.R. § 1208.13(b)(2)(iii). An individualized risk of persecution is one that is, at minimum, "more severe than that faced by" others, and a "pattern or practice" of persecution is persecution that is "systemic, pervasive, or organized." *Lie*, 396 F.3d at 537 (citation omitted). A fear of persecution is only objectively reasonable if the evidence shows that the persecution anticipated is a "reasonable possibility." *Shardar*, 503 F.3d at 313 (citation omitted).

To raise a prima facie case of asylum eligibility, "the applicant must produce objective evidence showing a reasonable likelihood that he can establish [that he is entitled to relief]." *Id.* (citation and internal quotation marks omitted). In other words, he must "show[] a realistic chance that [he] can at a later time establish that asylum should be granted." *Id.* (citation omitted).

Vana has not made out a prima facie case of asylum eligibility on the ground of his imputed Arab nationality.[5] Nothing in the record demonstrates that he "would face an individualized risk of persecution any more severe than that faced by" the general Arab population in Israel, and, thus, he has not established that he would be singled out for persecution. *Lie*, 396 F.3d at 537.

Vana likewise cannot show a pattern or practice of persecution of Arab nationals. Nothing in Vana's declaration supports such a finding; it only cites a few isolated

---

[5] The record does not suggest that Vana has suffered past persecution. We therefore must assess whether, absent such a showing, Vana has established a prima facie case of a well-founded fear of future persecution.

instances of past discrimination against Vana and his family in Israel and notes that, after Vana came to the United States, he "began to fear going back home" due to "hearing stories from friends back home about the division between people of [his] background and others[.]" (A.R. at 93.) That is far from the "severe humanitarian mistreatment" necessary to be classified as persecution, let alone a pattern or practice thereof. *Huang*, 620 F.3d at 380.

The voluminous country conditions evidence also does not show any pattern or practice of persecution of Arabs. That evidence, sad though it may be, indicates only that Arabs in Israel face, or are alleged to face, various forms of social, economic, legal, political, and institutional discrimination and inequality, and that several government actions have countered, with varying degrees of effectiveness, some of that discrimination and inequality. All persecution is unjust, but not all injustice amounts to persecution.

There is evidence of attacks against Arabs in Israel, but those attacks were limited to discrete instances or historical events and were often investigated or addressed by the government. Moreover, the clearest example of those attacks – described as an incident of police violence against Arabs while they were being attacked by Jewish citizens during a period when police had failed to protect Arabs from attacks on several occasions – occurred in October 2000, almost 20 years ago, and a Commission of Inquiry was established to examine the violence. That evidence does not suggest present "systemic, pervasive, or organized" persecution. *Lie*, 396 F.3d at 537 (citation omitted); *see also*

8

*Huang*, 620 F.3d at 380 (describing persecution); *Jarbough*, 483 F.3d at 191 (same); *Shardar*, 503 F.3d at 312 (same).

The country conditions evidence also discusses Israel's treatment, or alleged mistreatment, of specific sub-groups of its Arab population, such as Arab protestors (or suspected protestors), Arab politicians and activists, Arabs perceived as expressing political opinions in conflict with Israeli law or national security, Arab journalists, Palestinians,[6] Bedouins, and commonly Arab religious groups. Such evidence does not support a pattern or practice of persecution here because, even assuming a pattern or practice of persecution of those sub-groups, they are not "similarly situated" to Arabs in Israel generally; they possess traits that may render them more likely to experience mistreatment. 8 C.F.R. § 1208.13(b)(2)(iii)(A). Likewise, the evidence discusses Israel's

---

[6] In a section of his brief not addressing the asylum claim, Vana seems to assert that he has a Palestinian imputed nationality. If that is his assertion, it is new. His comments to the BIA emphasized more broadly that imputed Arab nationality was the basis of his claim. In light of that, we lack jurisdiction to consider it. 8 U.S.C. § 1252(d)(1). If an alien fails to raise an issue before the BIA, he has not exhausted his administrative remedies as to that issue, which strips us of jurisdiction over it. *Cadapan v. Att'y Gen.*, 749 F.3d 157, 159 (3d Cir. 2014). The exhaustion requirement is not onerous, but the BIA must have "sufficient information … to put it on notice of the issue being raised." *Liao v. Att'y Gen.*, 910 F.3d 714, 718 (3d Cir. 2018) (citation omitted). Here, the BIA was not on notice that it had to consider the issue of imputed Palestinian nationality as a ground for asylum.

actions toward Arabs and Palestinians in the occupied territories,[7] but such persons are not necessarily situated similarly to other Arabs in Israel. *Id.*

Because none of Vana's arguments suggest persecution, we conclude that he has not made out a prima facie case of eligibility for asylum, and the BIA did not err in so ruling.

Turning to Vana's assertion that the BIA incorrectly denied his motion to reopen *sua sponte* on the ground that he did not face exceptional circumstances, a jurisdictional problem immediately arises. We generally do not have jurisdiction to review denials of motions to reopen *sua sponte*. *Park v. Att'y Gen.*, 846 F.3d 645, 651 (3d Cir. 2017). Although there are limited exceptions to that rule, *id.* at 651-54, Vana does not invoke them, and, in any event, nothing suggests that an exception might apply. Accordingly, we cannot consider the issue.

## III.  CONCLUSION

For the foregoing reasons, we will deny Vana's petition in part and dismiss it in part for lack of jurisdiction.

---

[7] The term "occupied territories" has been used historically by the Department of State to refer to "the West Bank, Gaza Strip, Golan Heights, and East Jerusalem[,]" and it is the term used in the record here. (A.R. at 670.)

10