NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2957
_____

ADEL RAGEIB GEBRA,
Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA
_____

On Appeal from the Board of Immigration Appeals
Immigration Judge: Eugene Pugliese
(Agency No. A070-576-786)
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on September 20, 2022

Before: AMBRO[1], RESTREPO, FUENTES, *Circuit Judges*

(Filed: July 19, 2023)
_____

**OPINION**[*]
_____

---

[1] Judge Ambro took senior status on February 6, 2023.

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

RESTREPO, *Circuit Judge*.

In a case that spans 30 years, Adel Rageib Gebra, an asylum applicant, appeals the Board of Immigration Appeals' ("BIA") denial of his third motion to reopen after an adverse credibility determination. Because we conclude that the BIA abused its discretion in holding that Gebra's third motion to reopen did not present a new claim that was independent from the one previously found not credible and by ignoring certain arguments when comparing the evidence of changed country conditions, we grant the petition for review.

## I.  JURISDICTION

The BIA had jurisdiction to review the motion to reopen pursuant to 8 C.F.R. § 1003.2(c). This Court has jurisdiction pursuant to 8 U.S.C. § 1252(b)(6). Gebra timely filed his petition for review on October 22, 2021, within 30 days of the BIA's decision on September 30, 2021. *Id.* § 1252(b)(1). Venue is proper in this Court since the immigration court proceedings occurred within this Circuit in Newark, New Jersey. *Id.* § 1252(b)(2).

## II.  SUMMARY OF THE ISSUES

This appeal presents two controlling issues: whether the BIA abused its discretion by (1) failing to meaningfully compare the country conditions in 1998, at the time of his asylum hearing, with those in 2019, at the time Gebra filed his third motion to reopen; and (2) by ruling that Gebra did not present a new claim independent of the one previously found not credible.

2

## III. STANDARDS OF REVIEW

We review the BIA's denial of a motion to reopen under the highly deferential abuse-of-discretion standard. *Kucana v. Holder*, 558 U.S. 233, 242 (2010); *INS v. Abudu*, 485 U.S. 94, 107 (1988). We uphold the BIA's factual determinations if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

## IV. STATEMENT OF FACTS

Petitioner, Adel Rageib Gebra, is a native and citizen of Egypt. He is a Coptic Christian, a religious minority in Egypt targeted for conversion by Islamic Fundamentalists. According to Gebra, he was active in the Coptic community in Egypt and was the victim of multiple attacks from Islamic Fundamentalists due to his unwillingness to convert to Islam. He fled these attacks and entered the United States on or about November 15, 1992, on a non-immigrant visitor visa.

Gebra filed for asylum in 1993, claiming that he suffered past persecution and had a well-founded fear of future persecution in Egypt because of his religious beliefs, in particular his alleged refusal to convert to Islam. His application was denied in 1998 based on an adverse credibility finding due to inconsistencies in his testimony and in the evidence submitted, such as a police report that the Immigration Judge found potentially inauthentic.

In 2005, Gebra filed two unsuccessful motions to reopen. He then spent approximately two and a half years in immigration detention before he was released on supervised release and then deported to Egypt in 2009. A few months after his removal to

3

Egypt in 2009, Gebra was attacked by "Islamic extremists" because of his work as a cameraman for a well-known Coptic Christian priest. Gebra corroborated his claim of the 2009 attack with medical evidence and verification from organizations such as the United Nations High Commissioner for Refugees ("UNHCR"), which granted him refugee status after "a full investigation into the credibility of this event." Gebra fled to Lebanon in 2010 and currently resides there on a temporary status. He has not been officially resettled since becoming a refugee.

In 2019, ten years after the alleged second attack in Egypt, Gebra filed his third motion to reopen. In 2021, the BIA denied the third motion to reopen for two reasons. First, it did not agree that Gebra's evidence about violence in Egypt against Coptic Christians presented a "material, rather than incremental" change in country conditions. JA3. Second, the BIA found that Gebra did not present a new claim that was independent of the evidence that was found to be not credible in his 1998 hearing, and thus did not make a *prima facie* case of eligibility for relief that warranted reopening of the proceedings. Gebra subsequently filed the instant appeal.

## V. DISCUSSION

A motion to reopen asks the immigration court to reopen proceedings after a final decision has been rendered to consider new facts or evidence. 8 C.F.R. § 1003.23(b)(3). The motion will not be granted unless the evidence offered was previously unavailable and could not have been discovered or presented at an earlier stage in the proceedings. *Id.* § 1003.2(c)(1). A noncitizen may generally file one motion to reopen within ninety days of a removal order. 8 U.S.C. § 1229a(c)(7)(A), (C)(i)–(ii). However, in the case of

4

noncitizens applying for asylum, withholding of removal, or Convention Against Torture ("CAT") relief, a successive motion to reopen may be filed if the noncitizen can show (1) changed country conditions in his country of nationality or removal since the initial proceeding, and (2) *prima facie* eligibility for relief. *Id.* § (C)(ii).

### A. The BIA did not conduct a full and meaningful comparison of changed country conditions in Egypt.

First, we consider whether the BIA properly evaluated Gebra's allegations of changed country conditions in Egypt. In reviewing a motion to reopen, the BIA must "meaningfully consider[]" the evidence and arguments presented. *Fei Yan Zhu v. U.S. Att'y Gen.*, 744 F.3d 268, 272 (3d Cir. 2014) (citing *Zheng v. U.S. Att'y Gen.*, 549 F.3d 260, 266 (3d Cir. 2008)). While the BIA need not expressly parse each point or discuss each piece of evidence presented, it cannot ignore evidence favorable to the applicant. *Id* (quoting *Huang v. U.S. Att'y Gen.*, 620 F.3d 372, 388 (3d Cir. 2010)). To fulfill its requirements, the BIA must indicate that it has considered the evidence or, if it has rejected it, provide an explanation. *Id.*

When addressing a motion to reopen based on changed country conditions, the BIA has a heightened duty to explicitly consider any evidence of country conditions that materially bears on the applicant's claim. *Liem v. U.S. Att'y Gen.*, 921 F.3d 388, 395–96 (3d Cir. 2019). At the same time, the petitioner must show that the new evidence submitted is "material to their application for relief,", by alleging facts that, if proved, would be sufficient to change the result of their application. *Khan v. U.S. Att'y Gen.*, 691 F.3d 488, 496 (3d Cir. 2012). To determine whether the evidence accompanying a motion to

reopen demonstrates a material change in country conditions, we compare the new evidence submitted with the motion with the evidence submitted at the time of the underlying merits hearing. *Matter of S-Y-G-*, 24 I. & N. Dec. 247, 253 (BIA 2007).

The BIA only addressed one of three claims that Gebra made about Egypt's changed country conditions: that increased "sectarian killings" against Coptic Christians show that Islamic extremists have changed primary targets from tourists to Coptic Christians. Pet'r Br. 23–30. It rejected this argument, finding that the "greater numbers of casualties to Coptic Christians . . . demonstrates a continuation and persistence of the conditions for Coptic Christians in Egypt rather than a material change in conditions." JA4.

Generally, an increase in the number of pre-existing attacks alone is insufficient to establish a material change in country conditions. *See, e.g.*, *Pllumi v. U.S. Att'y Gen.*, 642 F.3d 155, 161 (3d Cir. 2011) (affirming the BIA's finding that the persistence of psychological pressures and terrorizing from religious and political extremists did not demonstrate a material change in country conditions); *Bamaca-Cifuentes v. U.S. Att'y Gen.*, 870 F.3d 108, 113 (3d Cir. 2017) (holding evidence that "largely dealt with ongoing problems [namely gang violence and repercussions from civil war that had existed for decades] . . . did not provide a basis for finding that there was a material change in conditions"). Similarly, the BIA has held that a continuation of or incremental change in a problem or policy is not enough to show a change in country conditions. *See Matter of F-S-N-*, 28 I. & N. Dec. 1, 6 (BIA 2020) (declining to find change in country conditions where evidence indicated that political unrest continued since time of hearing and that

conditions did not materially deteriorate since then); *Matter of S-Y-G-*, 24 I. & N. Dec. at 257 (holding that merely "incremental or incidental" changes in policy are immaterial).

Evidence suggests that, in 1998, Coptic Christians were already primary targets of Islamic extremists. Such evidence described "daily" attacks against them, including massacres and "dozens" of killings, forced conversions to Islam, extortion, and the destruction of Christian churches, homes, and businesses. JA3. Additional evidence available at the 1998 hearing described Coptic Christians as the Islamic extremists' "number 1" target because the extremists believed that Christians stood in the way of the formation of an Islamic state. *Id.* Without more, an increase in the number of attacks against Coptic Christians—even when compared to the number of attacks against tourists—does not represent a material change in country conditions. Thus, the BIA did not abuse its discretion in rejecting this argument.

Though the BIA justifiably rejected Gebra's first contention concerning Egypt's changed country conditions, it impermissibly ignored his alternative argument that the regime of Egyptian President Abdel Fattah el-Sisi, established in 2013, led to discriminatory legislative and judicial practices against Coptic Christians. *Fei Yan Zhu*, 744 F.3d at 272 (holding BIA must meaningfully consider the arguments and evidence presented on a motion to reopen). The passage of discriminatory laws that materially affect the applicant may constitute a change in country conditions. *See Shardar v. U.S. Att'y Gen.*, 503 F.3d 308, 314–15 (3d Cir. 2007) (holding re-emergence of political party that used criminal laws as a pretext to punish and harass members of the opposition constituted changed country conditions).

Gebra submitted evidence—including reports from Human Rights Watch, Amnesty International, and the U.S. Commission on International Religious Freedom, among others—that President el-Sisi's regime has passed blasphemy laws, severe penalties for conversion from Islam, and that his use of "customary reconciliation" in lieu of legal remedies adversely affects Coptic Christians, who are a religious minority in Egypt. Pet'r Br. 32–33; *Shardar*, 503 F.3d 308, 314–15; *Filija v. Gonzales*, 447 F.3d 241, 255–56 (3d Cir. 2006).

Moreover, the BIA ignored Gebra's second alternative argument that the founding of ISIS—a group that targets Coptic Christians in Egypt—shows an "increased ability of the potential persecutor to effectuate the persecution [and] can constitute 'changed country conditions.'" Pet'r Br. 25–27 (citing *Larngar v. Holder*, 562 F.3d 71, 78 (1st Cir. 2009) (holding that persecutor's rise to an official government position may constitute changed country conditions)). It is possible that a change in a terrorist regime may serve as the basis of changed country conditions. *See, e.g.*, *Shardar*, 503 F.3d at 315 (holding that re-emergence of prior political regime that persecuted petitioner qualified as a change in country conditions because this change created a "more intensive and predatory" environment than the one from which petitioner fled).

Evidence in the record shows that, like ISIS, terrorist groups in 1998 were "seeking to overthrow the Government and establish a purportedly Islamic state." JA389. However, Gebra claimed that compared to the allegedly "loose and unstructured illegitimate political [terrorist] groups" in 1998, ISIS is "more militarized and tightly organized" and has "clearer goals and expanded powers." Pet'r Br. 27. The BIA failed to address

8

these allegations. *Fei Yan Zhu*, 744 F.3d at 272. Accordingly, it abused its discretion when it made no inquiry into whether changes to the law in Egypt and the rise of ISIS constituted changes in country conditions.

### B. Gebra established a new claim independent from the one that was previously discredited.

In cases like this one, where the motion to reopen was filed after the petitioner received an adverse credibility finding in the underlying claim, the petitioner must either "overcome the prior [adverse] determination or show that the new claim is independent of the evidence that was found to be not credible." *Matter of F-S-N-*, 28 I. & N. Dec. 1, 3–4 (BIA 2020) (holding factual predicate of motion to reopen must be independent of testimony already found unbelievable). When new evidence "is contingent, in part or in whole, on factors that were determined to lack credibility and have not been rehabilitated, the [applicant's] ability to successfully establish prima facie eligibility may be undermined." *Id.* at 4.

To distinguish between "old" and "new" claims on a motion to reopen, the BIA established the following guidelines in *Matter of M-A-F-* (1) a claim is "new" where it presents a previously unraised basis for relief, such as fear of persecution on account of a different protected ground; (2) an application raised on the same protected ground may be considered a new claim if it is "predicated on a new or substantially different factual basis"; and (3) by contrast, a new claim that "merely clarifies or slightly alters the initial claim" will generally not be considered new. 26 I. & N. Dec. 651, 655 (BIA 2015).

9

Here, the BIA concluded that Gebra's "newly raised claim is not independent of his prior asylum claim, but supplements it and intertwines 'the new with the old.'" JA4 (citing *Matter of F-S-N-*, 28 I. & N. at 5). Gebra stated in his affirmation in the third motion to reopen, as he did at the 1998 hearing, that he owned a photo studio in Egypt and was the victim of "severe religious persecution" as a result of his status as a Coptic Christian. JA4. He also submitted a new translation of the suspect 1993 police report describing the alleged attack in his studio. *Id.*

But while Gebra's current claim is based on the same protected ground he raised in his 1998 hearing, it is a "new" claim because it is predicated on a "new or substantially different factual basis"—the alleged attack in 2009. Pet'r Br. at 42 (citing *Matter of M-A-F-*, 26 I. & N. Dec. at 651). In *Matter of M-A-F-*, the BIA concluded that an application was not "a continuation of the initial one" where the applicant alleged new facts regarding his participation in political protests that went beyond "simply correct[ing] minor errors or omissions present in the [original] claim.". 26 I. & N. Dec. at 652, 655. Similarly, here, Gebra alleged new information that he was attacked a second time in 2009 for his involvement with a well-known Coptic Christian priest. JA165; *cf. Paul v. Gonzales*, 444 F.3d 148, 156 (2d Cir. 2006) (holding that where the factual predicate for both the old and new claim relied on the same assertions, the adverse credibility ruling necessarily foreclosed both claims). Accordingly, Gebra's new claim is not a continuation of his old claim. Having determined that Gebra made a new claim, we now turn to the BIA's analysis of the evidence and whether Gebra established a *prima facie* case for asylum eligibility.

10

### i. *The BIA applied an overly rigorous standard to the new evidence.*

Gebra argues that the BIA applied an "overly rigorous standard" when analyzing the new evidence presented when determining whether he established a new claim. Pet'r Br. 44 (citing *Tilija v. U.S. Att'y Gen.*, 930 F.3d 165 (3d Cir. 2019)). In *Tilija*, we held that unless the new evidence is inherently unbelievable, it must be taken as true. 930 F.3d at 172; *see also Shardar*, 503 F.3d at 313 ("Facts presented in the motion to reopen are 'accepted as true unless inherently unbelievable.'") (cleaned up). If the BIA fails to accept new evidence as true, then it applies an "overly rigorous standard." *Tilija*, 930 F.3d at 172. Furthermore, not accepting such evidence as true is an abuse of discretion if the petitioner would have established a *prima facie* case for eligibility with the rejected evidence. *Id.* (citing *Shardar*, 503 F.3d at 313).

Here, the BIA did not find that the new evidence was inherently unbelievable but nevertheless refused to accept new evidence, such as Gebra's medical report after the 2009 attack, as "persuasive" or true because it "provide[d] little specificity or detail with respect to the alleged attack." JA4; *cf. Tilija*; 930 F.3d at 172 (finding that where the BIA asked for "more details" and questioned the veracity of the evidence, it impermissibly failed to accept the evidence as true). By requesting that the medical record, on its own, corroborate that the injuries were caused by "Islamic fanatics," the BIA imposed an overly rigorous standard. JA4; *Tilija*, 930 F.3d at 172. Similarly, the BIA's conclusion that the report from the Egyptian Union of Human Rights Organization ("EUHRO") pro-vides "no details" with respect to when, where, how, nor "any other details surrounding the circumstances of the alleged incident," was an abuse of discretion. JA4; *Tilija*, 930

11

F.3d at 172. The BIA treated the new evidence with the same "overly vigorous standard" that it applied to the new translation of the 1993 police report that was previously discredited.

Having concluded that the BIA held Gebra to an excessively rigorous standard, we next determine whether Gebra established a *prima facie* case for asylum.

### ii. *Gebra's new evidence established a* **prima facie** *case for asylum.*

Gebra's new evidence, accepted as true, establishes a *prima facie* case for asylum. A motion to reopen an asylum case must establish *prima facie* eligibility for relief. *Sevoian v. Ashcroft*, 290 F.3d 166, 173, 170–71 (3d Cir. 2002). This standard requires an applicant to produce objective evidence that shows a "reasonable likelihood" that they can establish eligibility for relief. *Id.* at 173. In this context, to "establish" means that the evidence in favor of asylum outweighs the evidence against. *Guo v. Ashcroft*, 386 F.3d 556, 564 (3d Cir. 2004), *as amended* (Dec. 3, 2004). A "reasonable likelihood" merely means showing a realistic chance that the applicant can later establish that asylum should be granted. *Id. Prima facie* "would lack meaning" if it required that evidence submitted at the *prima facie* stage conclusively establish eligibility for asylum. *Id.* Thus, Gebra need only provide objective evidence that shows a reasonable likelihood that he is entitled to asylum relief. *Tilija*, 930 F.3d at 172. Specifically, Gebra would need to demonstrate that he suffered past persecution, or has a well-founded fear of future persecution, on account of his religious beliefs. 8 U.S.C. § 1158(b)(1)(B) (enumerating religion as a protected ground).

12

Here, Gebra provided objective evidence in the form of medical records and human rights reports regarding his 2009 attack. For example, a December 8, 2009, medical report from Victoria Hospital in Egypt corroborates the statement in his affirmation that, due to the attack, he was "wounded and sent into the Victoria Hospital due to multiple contusions and dermal bleeding on [his] back and different parts of [his] body." JA167, 175; *see Doe v. U.S. Att'y Gen.*, 956 F.3d 135, 145 (3d Cir. 2020) (holding that a single beating, "if sufficiently egregious," may constitute persecution, such as where petitioner was beaten by a mob, causing him to bleed and suffer injuries to his head and back). Gebra also included medical reports of the psychological trauma he experienced and therapy sessions he attended as a result of the attacks. *Doe*, 956 F.3d at 145–46 ("Persecution may be emotional or psychological, as well as physical.") (citation omitted). Furthermore, the December 30, 2009, report from EUHRO stated that they independently "verified" Gebra was "attacked by some [Islamic] fanatics" who thought Gebra was behind demonstrations for the rights of Coptic Christians due to his work as a cameraman for Father Zacharia Botros, a Coptic Christian priest known for critiquing Islam. JA173. Taken together, this evidence demonstrates a reasonable likelihood that Gebra could establish he was persecuted due to his religious beliefs.

In sum, the BIA abused its discretion when it did not accept Gebra's evidence as true and concluded that he did not establish a new claim for asylum in his third motion to reopen.

## VI. CONCLUSION

For the foregoing reasons, we grant the petition for review.

13